**UNITED STATES of America**

v.

**FMC CORPORATION.**

Civ. A. No. 80–1570.

United States District Court,
E. D. Pennsylvania.

May 21, 1981.

Kurt Shaffert, Geraldine F. Katz, U. S. Dept. of Justice, Antitrust Division, Washington, D. C., for plaintiff.

Mari M. Gursky, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant; Joseph M. Fitzpatrick, Fitzpatrick, Cella, Harper & Scinto, New York City, of counsel.

MEMORANDUM

CAHN, District Judge.

 The United States has sued FMC Corporation ("FMC") for an alleged violation of 35 U.S.C. § 135(c). Section 135(c) requires parties to patent interference settlements to file any resulting settlement agreements with the United States Patent and Trademark Office. FMC has moved to dismiss the suit on the ground that § 135(c) does not establish a right of action in the United States, but only a defense available to a defendant in a patent infringement action. The statutory language provides

that a failure to file an interference settlement agreement will render the underlying patent unenforceable, but is silent as to the procedure by which the patent becomes enforceable. I hold the United States may sue to have such a patent declared unenforceable, and I will deny FMC's motion to dismiss.

## I. *FACTS*

FMC holds the patent for the agricultural pesticide carbofuran.[1] The Patent Office issued the patent to FMC as assignee of its employee following an interference between FMC and Bayer, a German chemical manufacturer.[2]

Before the termination of the interference, FMC entered into three written agreements with Bayer and two additional written agreements with Bayer's wholly-owned subsidiary Chemagro and one unwritten agreement with Bayer. The government alleges that each of these agreements was made in connection with or in contemplation of the termination of the interference within the meaning of 35 U.S.C. § 135(c). The United States further alleges that it notified defendant of the filing requirements of § 135(c).

Defendant filed one of the five written agreements, the "United States Patent Interference Settlement" between FMC and Bayer, dated September 10, 1968. Defendant did not file any other agreements with the Patent Office.

The Board of Patent Interferences decided in favor of FMC in Interference No. 95,192.

In an antitrust investigation, the United States Department of Justice discovered the unfiled settlement agreements. Its suit against FMC seeks, *inter alia*, a declaratory judgment that the patent is unenforceable due to FMC's failure to comply with § 135(c). It claims standing to sue because FMC's failure to comply with the filing requirement hindered the Justice Department-

ment's performance of its duty to enforce the antitrust laws by denying it one avenue of access to the unfiled agreements.

## II. *THE STATUTE*

35 U.S.C. § 135(c) reads, in pertinent part:

Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference as between the said parties to the agreement or understanding. If any party filing the same so requests, the copies shall be kept separate from the file of the interference, and made available only to Government agencies on written request, or to any person on a showing of good cause. *Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved.* The Commissioner may, however, on a showing of good cause for failure to file within the time prescribed, permit the filing of the agreement or understanding during the six month period subsequent to the termination of the interference as between the parties to the agreement or understanding.

(Emphasis added). No express provision is made for a method by which such patent becomes "permanently unenforceable."

## III. *DISCUSSION*

The issue of first impression before me is whether the United States has standing to enforce § 135(c) in declaratory judgment actions. Neither Congress nor the courts

---

**1.** U. S. Patent No. 3,474,171.

**2.** An interference is a proceeding in the United States Patent Office to determine which of two

or more parties claiming rights in an invention is the first inventor. 35 U.S.C. § 135(a).

have ever addressed this question directly.[3] The statute is silent as to who may enforce it. However, Congress passed § 135(c) solely to give law enforcement agencies access to interference settlement agreements. To limit the statute to use as a defense by patent infringers as FMC urges would increase the likelihood that violations would go undetected. This would frustrate the Congressional purpose of § 135(c). Applying rules of statutory construction, I conclude that Congress must have intended a right of action in the United States and will therefore imply one.

### A. THE LEGISLATIVE HISTORY OF § 135(c) SHOWS THE NECESSITY OF A RIGHT OF ACTION IN THE UNITED STATES

### 1. THE FILING REQUIREMENTS OF § 135(c) ARE DESIGNED TO BENEFIT THE PUBLIC AT LARGE

Section 135(c) was enacted in response to President Kennedy's call for remedial legislation in his consumer message of March 15, 1962:

In view of the potentially anticompetitive abuses to which the use of patents and trademarks are by nature subject, I recommend enactment of legislation requiring publication of the terms of all settlement agreements between different persons applying for patent rights on the same invention—for recent hearings have shown that such agreements may include features designed to weaken future competition at the expense of the consumer; . . . .[4]

In *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, the Supreme Court held a private interference settlement to be so inequitable as to preclude enforcement of the resulting patent even before the enactment of § 135(c). The Court commented:

The possession and assertion of patent rights are 'issues of great moment to the public.' [citations omitted] A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the 'Progress of Science and useful Arts.' At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

324 U.S. at 815–816, 65 S.Ct. at 997–998. *Precision Instruments* is another statement of the problem that led Congress to enact § 135(c). It was very much in the legislators' minds when they formulated their own statement of the problem:[5]

---

**3.** All reported cases on the failure to comply with § 135(c) filing requirements are actions between private parties. The reported cases are:

*PPG Industries, Inc. v. Bausch & Lomb, Inc.*, 205 U.S.P.Q. 914 (W.D.N.Y.1979); *Omark Industries, Inc. v. Carlton Co.*, 458 F.Supp. 499 (D.Ore.1978), aff'd mem. 636 F.2d 1227 (9th Cir. 1980); *Moog, Inc. v. Pegasus Laboratories, Inc.*, 376 F.Supp. 439 (E.D.Mich.1973) (first opinion), 376 F.Supp. 445 (E.D.Mich.1974) (second opinion), aff'd, 521 F.2d 501 (6th Cir. 1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 735 (1976); *Forbro Design Corp. v. Raytheon Co.*, 321 F.Supp. 1029 (D.Mass.1971) (summary judgment denied), 390 F.Supp. 794 (D.Mass.1975), aff'd on other grounds, 532 F.2d 758 (1st Cir. 1976); *Old Dominion Box Co. v.*

*Continental Can Co.*, 273 F.Supp. 550 (S.D.N.Y. 1967), aff'd on other grounds, 393 F.2d 321 (2d Cir. 1968).

In one other case, *Esso Research & Engineering Co. v. Brenner*, 165 U.S.P.Q. 486 (D.C.Cir. 1970) (per curiam), Esso sought to compel the Commissioner of Patents to extend the time for filing a "settlement" agreement regarding a patent interference proceeding.

**4.** Strengthening Programs for Protection of Consumer Interest—Message from the President, H.R.Doc. No. 364, 87th Cong., 2d Sess., reprinted in 108 Cong.Rec. 4167, 4170.

**5.** S.Rep. No. 2169, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, pp. 3286, 3288.

Recent experience has indicated that parties have sometimes used these interference proceedings in derogation of the public interest, in that interference settlement agreements have been entered into for the purpose of restricting competition. . . . [T]he bill would make it more difficult for patent applicants and owners to use an interference settlement agreement as a means of secretly violating the antitrust laws.[6]

The legislative history of § 135(c) does not reveal any additional purposes that the legislators may have in mind when they enacted the bill. Specifically, there is no evidence that Congress considered as a purpose of the bill the incidental benefit to a competitor who could use the offending patentholder's technology without a license.

## 2. CONGRESS DID NOT ADDRESS THE ISSUE OF WHO COULD ENFORCE § 135(c)

I have been unable to locate any discussion in the legislative history of the means by which the patent would become unenforceable.

FMC makes much of Congress's refusal to incorporate the following proposed language into the bill:

Should the parties to any such agreement or understanding fail to file a copy thereof as specified herein, a civil penalty of not more than $5,000 shall accrue to the United States and may be recovered in a civil action by the United States.

FMC emphasizes that another proposal which was included in the bill as enacted made no mention of a right of action in the United States, but that Congress rejected the only proposal that provided for such a right. FMC argues that by rejecting the second provision Congress meant to preclude the possibility of a civil action by the United States, except when the United States was a defendant in an interference action.[7] A better interpretation of this legislative decision is that a money penalty was deemed to be an additional unnecessary penalty. Congress decided patent unenforceability would be a sufficient deterrent. As shown by the following analysis of the legislative history, the legislators' decision concerned money fines and not the standing of the government to challenge a patent.

The original version of the bill that eventually became § 135(c) provided only for the invalidation of settlement agreements made

---

**6.** H.R.Rep. No. 1983, 87th Cong., 2d Sess. 1 (1962).

**7.** FMC argues that the President and Congress know what language to use when they want to create a right of action in the United States, that such language was not used here, and that this precludes implying a right of action. This argument fails for the reasons discussed in this subsection, namely: (i) Congress did not consider the issue of *who* would make a patent "permanently unenforceable," and (ii) a right of action in the United States is necessary for § 135(c) to accomplish its stated purpose.

It is irrelevant that the President, in his 1962 Consumer Message specifically mentioned a right of action in the United States to cancel trademarks that became common descriptive names but did not mention such a right in discussing patent interference settlement legislation. First, that the President asked expressly for standing for the United States in one context does not mean he did not want such standing in another context where he did not request it expressly. Second, what the President asked for had an indeterminate effect on what Congress actually did. Third, it is Congress's intent, not the President's, that controls.

It is also irrelevant that other patent laws are more specific as to who has standing to sue under them.

The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section. Rather, the court has generally avoided this type of 'excursion into extrapolation of legislative intent,' *Cort v. Ash*, 422 U.S. at 83, n. 14, [95 S.Ct. 2080, 2090, 45 L.Ed.2d 26] unless there is other, more convincing, evidence that Congress meant to exclude the remedy. . . .

*Cannon v. University of Chicago*, 441 U.S. 677, 711, 99 S.Ct. 1946, 1965, 60 L.Ed.2d 560 (1979) (citations omitted).

Finally, to accept FMC's argument is to preclude all implied rights of action. A defendant can always attack the standing of a plaintiff who is not given an express right of action by the statute he sues under on the ground that if Congress wanted to give the plaintiff the right to sue, it would have said so expressly. The law is to the contrary. *E. g. Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

in connection with patent interferences. The bill did not provide originally for the unenforceability of any resulting patent.[8]

The Department of Justice urged enactment of this legislation but urged two additions. Under the first, failure to file an agreement would render any patent issued on any application involved in the interference unenforceable. Under the second, the parties to an unfiled agreement would forfeit a civil penalty of up to $5,000 to the United States in a civil action.[9]

The first Department of Justice proposal was incorporated into the legislation.[10] The second proposal was not included because "[t]he subcommittee was of the opinion that unenforceability of unfiled agreements and of patents owned by parties to the unfiled agreements and involved in, or arising out of the proceedings, is a sufficient deterrent and that no worthwhile purpose will be served by superimposing a money fine."[11]

In urging the first modification the Deputy Attorney General wrote for the Department of Justice:

The purpose of this legislation is to make it more difficult for patent applicants to use an interference settlement agreement as a means of violating the antitrust laws. It seeks to accomplish this purpose by providing that no such agreement or understanding shall be enforceable unless all of its terms are in writing and filed prior to the termination of the interference proceeding. It is our view that this prohibition would not adequately deter violations of the antitrust laws. It is therefore suggested that the measure be amended to provide that parties to an interference settlement agreement shall be precluded from enforcing the resultant patent unless a copy of the settlement agreement has been filed in the Patent Office prior to the termination of the interference.[12]

In commenting on the bill containing the first modification, H.R. 12513, the Commissioner of Patents testified before the Senate Subcommittee as follows:

This bill ... simply creates a means for the agencies to collect information about whether there has been a violation of the present laws.[13]

In sum, nothing in this legislative history shows that legislators meant to preclude a right of action in the United States by rejecting the proposed money fine. On the contrary, the bill including the first modification was designed to help United States law enforcement agencies carry out their statutory investigatory duties.

3. SECTION 135(c) WOULD BE INEFFECTIVE IN ACCOMPLISHING ITS GOALS ABSENT A RIGHT OF ACTION IN THE GOVERNMENT

As it turns out, a procedure is required to resolve the status of some patents where unfiled settlement agreements are involved. The patent at issue here was granted twelve years ago. In that time FMC has not brought infringement actions against any competitor. Without a right of action in the United States, FMC would have control over the validity of its patent even if FMC has violated § 135(c). Although § 135(c) was designed to provide government access to all interference settlement agreements, the settlement agreements here at issue did not come to light until eleven years later and then only because of a Justice Department antitrust investigation.

Relying upon defendants in infringement suits to enforce compliance with § 135(c) is not sufficient to achieve the statutory purpose of making settlement agreements available to law enforcement agencies. Patent litigation is expensive. The challenger has a heavy burden of validity to

---

8. H.R. 11015, 87th Cong., 2d Sess. Introduced March 29, 1962.

9. *Hearings on H.R. 11015 before House Subcomm. No. 3 of the Comm. on the Judiciary,* Thurs. June 7, 1962, p. 9.

10. H.R.Rep. No. 1983, p. 2 (1962).

11. *Id.*

12. *Id.* at 5.

13. *Id.* at 12.

overcome. *See* 35 U.S.C. § 282. Certain challengers might not be able to afford discovery of the patent holder sufficient to uncover an unfiled settlement agreement in violation of § 135(c).

This is made clear by examining the hypothetical situation of an industry in which there are only three or four competitors. If all competitors in an oligopolistic industry are parties to an interference proceeding, and parties to a settlement, and if the settlement agreement is not filed, there will be no one to raise the violation of § 135(c). Therefore the violations of § 135(c) involving the most dangerous agreements, those which the statute was aimed at preventing, are the least likely to be detected under the construction of § 135(c) that defendant urges. Even if a challenger who knew of a violation of § 135(c) were to come forward, the patent holder could settle with him alone on favorable terms and still avoid revealing the existence of the interference settlement agreement to anyone else. This cannot be what Congress intended.

B. THIS IS A PROPER CASE TO IMPLY A NEEDED MEANS OF ENFORCEMENT

1. THE TEST FOR IMPLYING A RIGHT OF ACTION IN THE UNITED STATES UNDER § 135(c) MAY BE AS STRICT AS THE TEST APPLICABLE TO PRIVATE PARTIES

■ The federal government is "the ultimate parens patriae of every American citizen." *South Carolina v. Katzenbach*, 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966). Therefore, the United States has a right to bring suit to discharge its public duty even when there is no express statutory authorization to do so:

> Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assist-

ance in exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it standing in court.

*In re Debs*, 158 U.S. 564, 584, 15 S.Ct. 900, 906, 39 L.Ed. 1092 (1895).

The Supreme Court held that the United States had standing to sue for a violation of a duty created by the Rivers and Harbors Act of 1899 to keep navigable waterways clear. The Rivers and Harbors Act did not include an express right of action in the government. However, the Court stated:

> The Federal Government is charged with insuring that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction. *Cf. In re Debs.* The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States was obviously intended to prevent obstructions in the Nation's waterways.... And we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself.
>
> Our decisions have established, too, the general rule that the United States may sue to protect its interests.

*Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 385, 19 L.Ed.2d 407 (1967) (citations omitted).

*Wyandotte* suggested that the Court might be more lenient in implying rights of action in the United States. However, in *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), the United States Court of Appeals for the Third Circuit stated that *Wyandotte* was not an accurate statement of the law, but had been narrowed by subsequent opinions.[14] It stated that these opinions have revealed that the

14. These are: *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Supreme Court is "far more reluctant to infer rights of action from silent statutes." *Id.* at 8. The court of appeals observed in dictum that the government might be required to meet the same standard as a private party to have a cause of action inferred in its favor. *Id.* at 7–8. This standard is set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The *Cort v. Ash* test asks: (i) is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," (ii) is there any indication of legislative intent, explicit or implicit, to create or deny such a remedy, (iii) is the implied remedy consistent with the underlying purposes of the legislative scheme and (iv) is it inappropriate to imply a federal right of action because this type of cause of action is traditionally relegated to state law? 442 U.S. at 78, 95 S.Ct. at 2087.

The court of appeals in *United States v. City of Philadelphia* emphasized that several *express* private alternatives existed which were practical ways to enforce the statute at issue in that case, and that this weighed against implying an additional remedy. Finally, the court of appeals was concerned that a stricter standard apply where an injunction is sought.

### 2. THIS CASE MEETS THE REQUIREMENTS FOR IMPLYING A CAUSE OF ACTION

This case fully meets the stricter requirements of *United States v. City of Philadelphia*. First, application of a more lenient standard than that used for private parties is not required to infer a right of action in

the government here. This situation meets each prong of the *Cort v. Ash* test. Specifically: (i) the statute was expressly enacted for the government's benefit, (ii) there is no explicit indication of legislative intent to create or deny a remedy in the government, and implicit indications point to creating such a remedy for the reasons discussed above; (iii) a right in the United States is consistent with the purposes underlying § 135(c) since such a remedy is necessary to give § 135(c) the desired clout, and (iv) patents are not an area traditionally controlled by state law.

Second, unlike the civil rights provision at issue in *United States v. City of Philadelphia*, there are no *express* private means of enforcement in the statutory language of § 135(c). Third, although there is a theoretical difference between an injunction and the declaratory judgment at issue here, I do not rely on this distinction because there is little difference in practical effect between the two. Rather, I decide that because the United States easily meets the *Cort v. Ash* test and because of the absence of practicable private means of enforcement in § 135(c), the greater burden imposed on a plaintiff who seeks relief in the nature of equity [15] does not preclude a finding of standing for the United States.

I therefore find that the *United States v. City of Philadelphia* supports inferring a right of action in the United States here.[16]

### IV. CONCLUSION

The United States, specifically the Antitrust Division of the Department of Justice,

---

**15.** *United States v. City of Philadelphia*, at 191, n.1.

**16.** The Supreme Court has permitted the government to attack the validity of patents in other factual contexts. *United States v. Glaxo Group, .Ltd.*, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. American Bell Telephone Company*, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144 (1897). FMC emphasizes the dicta in these cases limiting the government's right to sue to attack a patent because it has no right of direct appeal from a Patent Office decision. FMC claims these dicta mean that for a court to exercise jurisdiction over a govern-

ment suit challenging the validity of a patent is an unjustified attempt to exercise appellate jurisdiction over the decisions of the Patent Office. *United States v. American Bell Telephone Company*, at 269, 17 S.Ct. at 821. No such problem is raised here. There is no decision of the Patent Office that is being effectively reviewed on appeal if this court grants the United States standing. The Patent Office never knew that defendant did not file additional agreements. The government here seeks an adjudication that FMC breached its duty to file the interference settlement agreements with the Patent Office. That this procedure may result in invalidity of the patent does not make it a review of the validity of granting the patent.

is the intended beneficiary of 35 U.S.C. § 135(c). As such it is entitled to use this statutory tool to protect the public, and has standing to bring an action to do so. My analysis of the legislative history of § 135(c) and the law applicable to implied rights of action supports this conclusion. To reach any other conclusion would seriously undermine the purposes for which Congress enacted § 135(c). FMC's motion to dismiss will be denied.