**UNITED STATES of America, Appellant in No. 82–1605,**

v.

**FMC CORPORATION, Appellant in No. 82–1640.**

**Nos. 82–1605, 82–1640.**

United States Court of Appeals, Third Circuit.

Argued April 25, 1983.

Decided Sept. 13, 1983.

William F. Baxter, Asst. Atty. Gen., Abbott B. Lipsky, Jr., Deputy Asst. Atty. Gen., John J. Powers, III, Frederic Freilicher (argued), Washington, D.C., for appellant in No. 82–1605; Kurt Shaffert, Kenneth M. Frankel, Attys., Dept. of Justice, Washington, D.C., of counsel.

H. Francis DeLone (argued), Stephen A. Stack, Jr., Mari M. Gursky, Mark C. Rahdert, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant in No. 82–1640.

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and STAPLETON, District Judge *.

---

* Hon. Walter K. Stapleton, United States District Court for the District of Delaware, sitting by designation.

1. An "interference" is an adversary proceeding in the Patent Office in which the Office establishes who among competing applicants for a patent is the first inventor under United States law. See 35 U.S.C. § 135(a) (1976).

2. Carbofuran, an insecticide effective against a variety of aphids, beetles, mites and ticks, is one of the largest selling pesticides in the world. App. at 537, 1685. FMC's sales of carbofuran approximate $190 million yearly. Id. at 537.

3. FMC filed a patent application on carbofuran in the United States Patent Office on January

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The question whether Congress has impliedly authorized a right of action to enforce a statute raises important issues under the doctrine of the separation of powers. Whether the right of action is asserted by a private party or by the United States government, these issues are of equally broad import. In this case, the United States claims a right of action to sue to invalidate a patent under 35 U.S.C. § 135(c). No provision of law expressly sanctions such an action. It is now necessary to decide whether Congress nevertheless impliedly authorized lawsuits by the United States to invalidate a patent when the patent holder violates 35 U.S.C. § 135(c) by not filing with the government the agreements executed to settle a patent interference dispute. We hold that it did not.

### I.

FMC Corporation is a manufacturer of agricultural insecticides. In 1968 FMC and a competitor, Bayer A.G., settled a patent interference proceeding [1] in which Bayer had contested the rights to a patent on carbofuran,[2] an agricultural insecticide.[3] FMC and Bayer memorialized their 1968 interference settlement in five documents.

The agreement applicable to the United States settled the interference claim between FMC and Bayer then pending in the United States Patent Office. It also stipulated that FMC would retain the exclusive right to manufacture and sell carbofuran in

---

23, 1964; Bayer filed a patent application in the United States on the same invention in May of 1964. The Patent Office declared an interference between these competing applications in September of 1965, entertaining more than 60 witnesses and 4300 pages of evidence before closing the interference record in May of 1968. FMC—which had by this time invested several million dollars in a carbofuran plant—then opened negotiations with Bayer for the purpose of settling the United States interference and licensing patent rights in foreign countries. The parties negotiated the settlements giving rise to this litigation between May and August of 1968.

this country; that FMC was to sell carbofuran to a Bayer subsidiary, Chemagro, at favorable prices; and that FMC was to disclose to Chemagro the technology to produce carbofuran.

In the other four agreements, FMC and Bayer disposed of patent rights in Canada and certain countries of Central and South America. The agreements also established the terms under which carbofuran would be produced and its trademark licensed.

On September 18, 1968, FMC filed with the Patent Office only the settlement agreement applicable in the United States. It was deposited in accordance with 35 U.S.C. § 135(c) (1976), which provides that any "agreement or understanding between parties to an interference" made "in connection with or in contemplation of the termination of the interference" shall be filed in the Patent and Trademark Office before termination of the interference. The sanction for the failure to file an agreement is the permanent unenforceability of both the patent and the agreement.[4] FMC did not, however, file the other four agreements with the Patent Office, apparently believing that none of these four agreements was made "in connection with or in contemplation of" the termination of the United States interference.

All five agreements among FMC, Bayer, and Chemagro came to the attention of the Antitrust Division of the Department of Justice in 1978, during an investigation of possible Sherman Act violations on the part of FMC. The Department of Justice ascertained that FMC had not filed four of the five agreements with the Patent Office and initiated the present action against FMC on April 23, 1980. The complaint alleged that each of the four unfiled agreements was "made in connection with or in contemplation of" the termination of an interference proceeding, and that none of the four agreements was filed with the Patent Office in accordance with 35 U.S.C. § 135(c). The United States sought a declaration that by not filing the four agreements FMC violated section 135(c), a declaration that FMC's carbofuran patent be denominated "permanently unenforceable," and an injunction enjoining the patent's enforcement.

On May 21, 1981, the district court denied FMC's motion to dismiss the government's suit for failure to state a claim, holding that section 135(c) creates an implied right of action in favor of the United States to declare a patent invalid and to enjoin its enforcement.[5] The district court denied FMC's motion to permit an interlocutory appeal from this order, and directed that the parties proceed to trial on the question whether the four unfiled agreements were made "in connection with or contemplation of" the termination of the 1968 dispute. After extended litigation, the district court entered judgment on the merits for FMC on August 24, 1982, finding that none of the four unfiled agreements was made "in connection with or contemplation of" the termination of an interference as those words are used in section 135(c).

The United States appeals from the district court order entering judgment on the merits for FMC. FMC cross appeals from the district court's order holding that section 135(c) creates an implied right of action in favor of the United States. We have jurisdiction under 28 U.S.C. § 1291 (1976).

## II.

The statute under which the United States claims a right of action, 35 U.S.C. § 135(c) (1976), originated with President Kennedy's "Consumer's Protection and Interest Program." In a 1962 Message on the

---

4. Section 135(c) provides that:
   Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved.

5. The government neither alleged nor argued that it sues as parens patriae representative of the class of private persons who may enforce section 135(c). Consequently, we do not deal with such a contention here.

State of the Union, the President proposed a variety of reforms intended to fill "serious statutory gaps" in consumer legislation, including "laws promoting competition and prohibiting monopoly." *See Message from the President of the United States Relative to Consumers' Protection and Interest Program,* H.R.Doc. No. 364, 87th Cong., 2d Sess. 6, 9–10, *reprinted in* 108 Cong.Rec. 4167, 4169–70 (1962) [hereinafter *President's Message*].

Among the measures endorsed by the President was legislation "which would provide subpoena powers for civil as well as criminal antitrust investigations." *Id.* at 9, 108 Cong.Rec. at 4170. This statute, eventually enacted as the 1962 Antitrust Civil Process Act,[6] authorizes the Justice Department's Antitrust Division to issue a "Civil Investigative Demand" (or "CID") for "any information[ ] relevant to a civil antitrust investigation." 15 U.S.C. § 1312(a) (Supp. V 1981). The CID is the conventional means by which the Division obtains information prior to the filing of a complaint. *See United States v. Consolidated Foods Corp.,* 455 F.Supp. 142, 146 (E.D.Pa.1978). It apparently was the means by which the Division obtained access to the five agreements between FMC and Bayer in this case. The Civil Process Act imposes stringent confidentiality requirements on the use of information obtained in response to a CID.[7]

In addition to endorsing the Antitrust Civil Process Act, the President proposed legislation "requiring publication of the terms of all settlement agreements between different persons applying for patent rights on the same invention." *President's Message, supra,* at 9, 108 Cong.Rec. at 4170. "Recent hearings," the President stated, "have shown that such agreements may include features designed to weaken future competition at the expense of the consumer." *Id.* In the same paragraph, the President also advocated expanding the power of the FTC to apply for the cancellation of a trademark. *Id.* The President did not, however, urge a correlative power for the Justice Department to sue to invalidate settlement agreements relating to patent interference.

A House subcommittee entertained a bill implementing the President's suggestion in April of 1962.[8] When it was introduced, H.R. 11015 simply provided:

> No agreement or understanding made in connection with or in contemplation of the termination of an interference shall be enforcible [sic] unless in writing and a copy thereof filed in the proceeding before termination thereof.

*House Hearings, supra* note 7, at 1. Members of the Patent Office and the Justice Department confirmed that the bill was intended to address potentially fraudulent or collusive terms in agreements settling interferences. *Id.* at 8, 24. As the Commerce Department described it,

> [t]he purpose of such a statute is to provide assurances by the resulting availability of information to the public and to law enforcing agencies of the Government that such agreements do not have the effect of minimizing competition in a manner which is either illegal or, to the extent that publicity deters, otherwise detrimental to the public welfare.

*Id.* at 7.

Although the bill's original language would have invalidated an agreement settling a patent interference, but not the underlying patent, the subcommittee subsequently adopted a Justice Department recommendation that the patent itself be ren-

---

6. Pub.L. No. 87–664, 76 Stat. 548 (codified as amended at 15 U.S.C. §§ 1311–1314 (1976 & Supp. V 1981)). Congress approved the Civil Process Act on September 19, 1962, 26 days before the enactment of section 135(c). *See* Pub.L. No. 87–831, 76 Stat. 958, 959 (approved on October 15, 1962).

7. *See* 15 U.S.C. §§ 1313(c)(3), 1314(g) (Supp. V 1981). For the purposes of this appeal, we will

therefore assume that the Justice Department could not disclose to competitors of FMC, without FMC's consent, the existence of the four unfiled agreements between FMC and Bayer.

8. *See Hearings on H.R. 11015 before Subcommittee No. 3 of the Committee on the Judiciary,* 87th Cong., 2d Sess. 2, 8–9 (1962).

dered invalid as well as the agreement. The Department believed that unless the patent were invalidated, "this prohibition would not adequately deter violations of the antitrust laws." *Id.* at 9.

The Department also urged that the bill provide "a right of action in the United States to obtain a civil penalty for failure to file a copy of an interference agreement." *Id.*[9] This civil penalty provision, however, met with skepticism.[10] After Commissioner of Patents David Ladd testified that a civil penalty would be unnecessary,[11] the subcommittee abandoned the proposal. The House Report explained that:

[t]he subcommittee was of the opinion that unenforceability of unfiled agreements and of patents owned by parties to the unfiled agreements and involved in, or arising out of the proceedings, is a sufficient deterrent and that no worthwhile purpose will be served by superimposing a money fine.

H.R.Rep. No. 1983, 87th Cong., 2d Sess. 2 (1962).

As finally enacted, the language of section 135(c) did not specify how its sanction—the invalidation of the patent and agreement—was to be enforced. The legislative history, however, reveals that Congress understood this sanction would be available in an infringement action under 35 U.S.C. §§ 271, 281 (1976). In testimony before the House subcommittee, the Commissioner of Patents lauded proposed section 135(c) because it would make licensing agreements available in an infringement action:

I do think that it is desirable for these things to be on record for this reason. It is not clear cut that in private litigation between a patentee and a defendant in a patent infringement suit that he will automatically under the Federal discovery rules have access to license agreements. I myself have been involved in cases where the court has refused access to those until after the issues of validity and infringement are determined.

*House Hearings, supra* note 7, at 25. Moreover, it was well understood that jurisdiction would lie under 28 U.S.C. § 1338(a) (1976) in an action by the putative infringer of a patent for a declaration of non-infringement.[12] Apparently, therefore, Congress anticipated that section 135(c) could be used either defensively in an action by a patentee for infringement, or offensively in an action by a potential infringer for a declaration of noninfringement.

The legislative history does not speak directly to whether Congress envisioned such actions as an exclusive means of enforce-

---

**9.** After consulting with the Justice Department, the Patent Office proposed the following statutory language:

Should the parties to any agreement or understanding fail to file the copy thereof as specified herein, a civil penalty of not more than $5000 shall accrue to the United States and may be recovered in a civil action by the United States.

*House Hearings, supra* note 7, at 23.

**10.** Representative Willis, author of H.R. 11015, stated:

Now, you want to go beyond [disclosure] and punish a party. I don't see any necessity for a penalty because personally I have never thought too much that this should be an executive sanction.

*House Hearings, supra* note 7, at 10. Edward F. McKie, Treasurer of the Board of Managers, American Patent Law Association, asserted that both the proposed fine and invalidation of the patent "are much too drastic for the mere nonfiling of the agreement." *Id.* at 18.

**11.** Commissioner Ladd testified that:

[S]ince we do not know the magnitude of the evil at which this is directed, and reminding ourselves that it is not intended to provide a substantive definition of a crime but merely to encourage the disclosure of evidence on which it can be determined whether a violation of the law has occurred, it would suggest to me that perhaps the penalty, the fine which is suggested is not needed.

*House Hearings, supra* note 7, at 25.

**12.** *See E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852 (7th Cir.1937); Note, *Developments in the Law: Declaratory Judgments—1941–1949*, 62 Harv.L.Rev. 787, 802–03, 863–64 (1949); H. Hart & W. Wechsler, *The Federal Courts and the Federal System* 896–97 (2d ed. 1973); *cf. Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 448 F.2d 1328, 1331 (3d Cir. 1971).

ment, or whether Congress also anticipated actions by the United States for a declaration of invalidity of a patent. It is that issue, critical to this appeal, that we now address.

## III.

■■■ Specification of remedies for the enforcement of statutory rights is largely within the province of the legislature. This principle derives, at least in part, from the doctrine of the separation of powers, which assigns to Congress the function of enunciating applicable rules of law and to the judiciary the function of interpreting those rules in cases or controversies.[13] Separation-of-powers principles caution against an expansive judicial role in the creation of implied remedies for the enforcement of statutory rights. Implied rights of action may alter the remedial scheme devised by Congress for the enforcement of statutory programs and thus place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.

■■ Separation-of-powers concerns apply with equal weight whether the enforcing party is a private litigant or the United States. In either case, the central problem is the same: did Congress intend to authorize a right of action about which the statute is silent? The Supreme Court has consistently held that the touchstone for the existence of an implied remedy is "the intent of the Legislature." *Middlesex County Sewerage Auth. v. National Sea Clammers,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69

L.Ed.2d 435 (1981).[14] At least in the present case, we see no reason to deviate from that approach simply because the would-be plaintiff is the United States rather than a private party. *See United States v. City of Philadelphia,* 644 F.2d 187, 193–94 (3d Cir.1980). Accordingly, we turn to the criteria for discerning legislative intent that the Supreme Court has announced in recent decisions on implied private rights of action.

## A.

The seminal case governing the judicial "implication" of rights of action is *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* enumerated four standards to assist in the determination of whether a "private remedy is implicit in a statute not expressly providing one":

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

**13.** Professor Neuborne defines the legislative function of prescribing generally applicable rules as "enumeration"; the judicial function of interpretation and application as "particularization"; and the executive function of enforcing legal norms as "implementation." *See* Neuborne, *Judicial Review and Separation of Powers in France and the United States,* 57 N.Y.U.L.Rev. 363, 370 (1982). Classical democratic theory assigns the role of "enumeration" to the legislature on grounds of efficiency, *see* J.S. Mill, *Considerations on Representative Government* chs. 3–6 (C. Shields ed. 1958), and legitimacy, *see* J. Locke, *The Second Treatise of Government* chs. 8, 11 (P. Laslett ed. 1960).

**14.** *See Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981); *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

In subsequent cases, the Supreme Court has explained that the four factors set forth in *Cort* are "criteria" to be used in determining whether Congress intended to authorize a right of action. *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981). Accordingly, the Court has held that:

> Congressional intent may be discerned by looking to the legislative history and other factors: *e.g.,* the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the states in providing relief. *See California v. Sierra Club, supra; Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

*Texas Industries, Inc., supra,* 451 U.S. at 639, 101 S.Ct. at 2066.[15]

*Cort's* four factors are not given the same weight. If the legislative history reveals congressional intent to create a right of action, the court's inquiry is at an end. "[T]here is no need for us to 'trudge through all four of the factors when the dispositive question of legislative intent has been resolved.'" *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982), *quoting California v. Sierra Club, supra,* 451 U.S. at 302, 101 S.Ct. at 1783 (Rehnquist, J., concurring). On the other hand, if the legislative history is silent, a right of action may nevertheless be implied if the first factor is satisfied—that is, if "the language of the statutes indicates that they were enacted for the special benefit of a class of which petitioner is a member." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 91–92, 101 S.Ct. 1571, 1580–81, 67 L.Ed.2d 750 (1981), *citing Cannon v. University of Chicago,* 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). If, however, both of the first two factors fail, "the remaining two *Cort* factors cannot by themselves be a basis for implying a right of action." *Touche Ross,*

*supra,* 442 U.S. at 580, 99 S.Ct. at 2491 (Brennan, J., concurring); *see California v. Sierra Club, supra,* 451 U.S. at 298, 101 S.Ct. at 1781 (the third and fourth "factors are only of relevance if the first two factors give indication of congressional intent to create the remedy").

Since 1975, the Supreme Court has elaborated considerably on the significance of the first *Cort* factor—the "especial benefit" test. The Court has noted that benefit to certain parties is, by itself, irrelevant: "[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club, supra,* 451 U.S. at 294, 101 S.Ct. at 1779. The Court has devoted careful attention to the existence or absence of "right-conferring" language in the act. Language "explicitly confer[ring] a right directly on a class of persons that included the plaintiff in the case" is understood as indicative of congressional intent to establish a cause of action. *See Universities Research Ass'n v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981), *citing Cannon, supra,* 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13. Conversely, when the statute is of a general proscriptive character—that is, when the statute simply imposes a duty without "an unmistakable focus on the benefited class," *Cannon, supra,* 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13—the Court has found "far less reason" to infer a remedy from a silent statute. *Id.; see also California v. Sierra Club, supra,* 451 U.S. at 294, 101 S.Ct. at 1779; *Coutu, supra,* 450 U.S. at 772, 101 S.Ct. at 1462.

The Supreme Court has also sought guidance in Congress' understanding of the law as it existed on the date of a statute's enactment. "It is always appropriate," the Court has observed, "to assume that our elected representatives, like other citizens, know the law." *Cannon, supra,* 441 U.S. at 696–97, 99 S.Ct. at 1957–58. Consequently,

---

15. For similar formulations of this standard, see *Middlesex County Sewerage Auth., supra,* 453 U.S. at 13, 101 S.Ct. at 2622; *Northwest Airlines, Inc. v. Transport Workers Union,* 451

U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981); *Universities Research Assoc. v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981).

[w]hen Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, ... Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy.

*Merrill Lynch, supra,* 456 U.S. at 378–79, 102 S.Ct. at 1839–40.

Finally, the Court has accorded particular significance to the presence of alternative provisions for enforcement. The existence of administrative enforcement procedures, or of express alternative rights to sue in the government or private citizens, are presumptive, although not conclusive indicators that Congress intended these procedures to be the exclusive means of enforcement. *See Middlesex County Sewerage Auth., supra,* 453 U.S. at 14, 101 S.Ct. at 2623 (" 'it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it,' " *quoting Transamerica, supra,* 444 U.S. at 19, 100 S.Ct. at 247). *But see Cannon, supra,* 441 U.S. at 711, 99 S.Ct. at 1965 ("[t]he fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section").

### B.

The Supreme Court forged the foregoing directives in the course of addressing implied *private* rights of action. The Court, however, has devoted considerably less attention to implied rights of action in favor of the United States. Moreover, the leading case on implied rights in favor of the United States preceded *Cort v. Ash* by a number of years. *See Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). Because the Supreme Court has acknowledged that "[i]n 1975 the Court unanimously decided to modify its approach to the question whether a federal statute includes a private right of action," *Merrill Lynch, supra,* 456 U.S. at 377, 102 S.Ct. at 1838, we must consider the extent to which the reasoning in *Wyandotte* survives the Court's more recent analysis.

In *Wyandotte* the Supreme Court authorized an implied right of action on behalf of the United States under the Rivers and Harbors Act of 1899. Section 15 of that Act imposed a duty on the owner of a sunken vessel to mark and remove the vessel; section 19 of the Act permitted the government to proceed *in rem* against the vessel and sell it, but did not authorize a right of action against the owners for damages. The United States in *Wyandotte* found itself obliged to remove several sunken vessels, one of which constituted an extraordinary danger to the public welfare, and sued the owners for the cost of the removal.

The Court found the United States "a principal beneficiary of the Act, if not the principal beneficiary." *Id.* 389 U.S. at 201, 88 S.Ct. at 385. In addition, the Court noted, the government was empowered under the Act to bring criminal proceedings against an offending owner. *Id.* at 198–99, 88 S.Ct. at 384–85. Moreover, the right to proceed injunctively and by declaratory judgment had already been implied in favor of the government, making a damage action an additional form of remedy rather than a new remedy altogether. *Id.* at 203–04, 88 S.Ct. at 386–87. The Court also commented on the relevance of two peculiarly important circumstances: the urgent necessity of removing a menace to the public health, requiring immediate action by the government, and the prospect that in the absence of an implied remedy the negligent owner would profit by his own wrong. *Id.* at 204, 88 S.Ct. at 387. Without elaborating on the weight accorded each of these considerations, the Court declared that the remedies expressly enumerated in the Act "were not intended to be exclusive." *Id.* at 201, 88 S.Ct. at 385.

In light of the Supreme Court's more restrictive approach to implied remedies since *Cort v. Ash,* it is now questionable that *Wyandotte* permits courts to infer

a right of action in the United States simply because the statutory remedies appear inadequate. *See United States v. City of Philadelphia, supra,* 644 F.2d at 191–93. The cases following *Cort* make clear that the apparent necessity of an implied private remedy will not justify its recognition unless Congress intended to authorize it. Given that the analysis in *Wyandotte* is grounded in decisions dealing with implied private remedies, 389 U.S. at 202, 88 S.Ct. at 386, it would seem that the test for inferring rights of action in the government should now change along with the test for inferring rights of action in private parties. Accordingly, here we follow the more refined approach to implied remedies developed after *Wyandotte* and conclude that the ultimate question in deciding whether to recognize a right of action in favor of the United States is congressional intent.

Other aspects of *Wyandotte's* rationale, however, remain vital after *Cort.* First, whether the United States is the act's intended beneficiary, and whether Congress intended to confer a right of action on that beneficiary, remain important. Particular heed must be paid, however, to the Court's admonition not to adopt a "broad-gauge approach" to whether a party is an "especial beneficiary" of the act. *California v. Sierra Club, supra,* 451 U.S. at 294, 101 S.Ct. at 1779. The inquiry is not simply whether the United States would benefit from the act, but whether Congress intended to confer on the United States the right to sue. *Id.*

Second, the question whether the act vests the United States with a right of action of a different form remains an indicator of congressional intent. The observation of Justice Powell, dissenting in *Cannon, supra,* is particularly apt in this respect:

In *Wyandotte* and *Republic Steel,* the Government already had a "cause of action" in the form of its power to bring criminal proceedings under the pertinent statutes. Thus, the Court was confronted only with the question whether the Government could exact less drastic civil penalties as an alternative means of enforcing the same obligations.

441 U.S. at 733 n. 3, 99 S.Ct. at 1976 n. 3 (Powell, J., dissenting).

## IV.

The foregoing analysis requires that we begin our consideration of section 135(c) by examining: (1) the language of the statute, with special attention to its right-conferring nature and to the existence of alternative means of enforcement; and (2) the legislative history, with particular scrutiny of the congressional understanding prevalent at the time of the statute's enactment.[16]

## A.

Section 135(c) provides that the failure to file an agreement or understanding regarding the settlement of the patent dispute "shall render permanently unenforceable such agreement or understanding and any patent of such parties involved." This language focuses on the class of persons on whom a duty is imposed—parties to an interference settlement—and not on a class of intended beneficiaries—here assertedly the United States. As such, the language parallels duty-creating provisions from which the Court has consistently declined to infer rights of action. *See Cort v. Ash, supra,* 422 U.S. at 68, 78–79, 95 S.Ct. at 2087–2088 (criminal statute prohibiting corporate campaign expenditures); *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 456, 94 S.Ct. 690, 692, 38 L.Ed.2d 646 (1974) (failure to conform with Amtrak Act); *Cannon, supra,* 441 U.S. at 690–92 n. 13, 99 S.Ct. at 1954–55 n. 13 ("the Court has been especially reluctant to imply causes of action under stat-

---

**16.** *See* note 14 *supra; Middlesex County Sewerage Auth., supra,* 453 U.S. at 13, 101 S.Ct. at 2622:

We look first, of course, to the statutory language, particularly to the provisions made therein for enforcement and relief. Then we review the legislative history and other traditional aids of statutory interpretation to determine Congressional intent.

utes that create duties on the part of persons for the benefit of the public at large").

■ The United States maintains, however—and the district court concluded, *see United States v. FMC Corp.,* 514 F.Supp. 1166, 1172 (E.D.Pa.1981)—that section 135(c) "was expressly enacted for the government's benefit." Congress enacted section 135(c), the government urges, as a source of information for agencies charged with enforcing the antitrust laws. The government's claim that it is the especial beneficiary of information from section 135(c) ignores part of the statute's effect. Section 135(c) operates as a self-enforcing deterrent as well as a source of information: competitors contemplating the collusive settlement of a patent interference claim must risk the disclosure of the collusive terms of such a settlement or, if they attempt to keep the agreement secret, they risk invalidation of the underlying patent.[17] Moreover, to the extent that the purpose of section 135(c) is to generate investigative information as well as provide a deterrent to the patent owner who has entered into the agreement, the section benefits private antitrust litigants as well as the Department of Justice, undermining the government's claim as an "especial beneficiary."

Indeed, the record before the district court suggests that the government is at most a secondary beneficiary of the investigative assistance provided by section 135(c). The government's most effective source of investigative information appears not to be section 135(c), but rather the civil investigative demand ("CID") authorized by the Antitrust Civil Process Act. *See* p. 778 *supra.* Because the CID permits the government to subpoena any person reasonably believed to possess material relevant to an antitrust investigation, and because it permits such discovery before commencement of any suit, *see* 15 U.S.C. § 1312(a) (Supp. V 1981), the CID may ferret out unfiled

agreements that would otherwise remain undiscovered. In this case, the government relied on the fortuitous discovery of unfiled agreements in the course of processing CID's. *App.* at 2265, 2270. Although the settlement agreement between FMC and Bayer relating to the United States had been on file since 1968, no member of the Justice Department or the Patent Office reviewed that agreement until 1978 when FMC disclosed it pursuant to a CID. *Id.*

Surely the government is the especial beneficiary of the CID, for it alone may use this procedure. But the primary beneficiary of the weaker investigative assistance provided by section 135(c) appears to be the private antitrust litigant. Prior to filing suit, the potential private litigant must rely exclusively on section 135(c) for information on interference settlement agreements. Thus while the United States benefits especially from the CID, it is not the government, but rather private parties who especially benefit from section 135(c).

The government's claim as an especial beneficiary is further weakened by the diffuse sense in which it benefits from disclosure of interference settlements. The government's benefit in this case differs fundamentally from that in *Wyandotte,* in which the United States suffered a direct fiscal loss of $3,081,000, 389 U.S. at 195, 88 S.Ct. at 382, as a corporate entity and not merely as representative of the entire citizenry's interests. In this case, by contrast, the government is simply a surrogate for the interests of the populace at large; the government "benefits" from section 135(c) only in the sense that the citizenry obtains benefits indirectly. The Supreme Court has cautioned, however, that "such a definition of 'especial' beneficiary" on the part of the public "makes this factor meaningless." *California v. Sierra Club, supra,* 451 U.S. at 294, 101 S.Ct. at 1779.[18] Under such a

---

17. Congress understood this deterrent function well. See *House Hearings, supra* note 7, at 12.

18. In *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Court held that § 10 of the Rivers and Harbors Appropriations Act of 1899, prohibiting "ob-

struction[s]" to the "navigable capacity" of waters of the United States, was not designed for the "especial benefit of private parties who may suffer 'special injury' caused by an unauthorized obstruction to a navigable waterway." *Id.* at 293–94, 101 S.Ct. at 1778–79. Under this

standard courts would have the latitude to create a right to sue by the United States almost without limit.

Even assuming that the United States may be considered an intended beneficiary of section 135(c), a deeper flaw in the government's argument then emerges. The United States sues not to compel disclosure of information, but to invalidate a patent. The government is the beneficiary of the invalidation of FMC's patent only in the attentuated sense that the deterrent value of such action will encourage future disclosures of information. Unlike the implied remedy granted to the United States in *Wyandotte*—repayment of the government's emergency expenditures—the remedy claimed in this case does not compensate the government for its injury. Rather, the immediate beneficiaries of the patent's invalidation are FMC's competitors. Those competitors, however, have an express right of action for a declaration of non-infringement under 28 U.S.C. § 1338(a), and therefore need not claim an implied right of action under section 135(c).

In sum, the United States is an "especial beneficiary" of the provision for invalidation of a patent only in a tangential sense. It benefits in that the power to sue generates an incentive to disclose future agreements. But such disclosure aids private parties far more than the United States since the government can use the CID. Moreover, the remedy of patent invalidation directly assists a patentholder's competitors, not the government. The especial benefit test thus provides no basis for inferring a right of action in favor of the United States.

### B.

Section 135(c) does not, on its face, specify a means of enforcement. The Act provides for neither administrative enforcement mechanisms nor private rights of action, although it clearly contemplates private infringement proceedings in which the invalidity of a patent could be raised as a defense. *Cf. Transamerica, supra,* 444 U.S. at 18, 100 S.Ct. at 246,[19] *see Middlesex County Sewerage Auth., supra,* 453 U.S. at 14, 101 S.Ct. at 2623; *United States v. City of Philadelphia, supra,* 644 F.2d at 192–93 (noting alternative remedial mechanisms). As *Transamerica* makes plain, however, the assumption that a patent's invalidity may be raised defensively in private litigation does not imply a correlative private right of action for damages and *a fortiori* does not imply a right in the United States to sue for a declaration of invalidity. This enforcement factor therefore inclines neither toward nor away from an implied right of action.

### C.

The existence of an implied right of action in the United States was not "part of the 'contemporary legal context' in which" the drafters of section 135(c) legislated. *See Merrill Lynch, supra,* 456 U.S. at 381, 102 S.Ct. at 1841; *Cannon, supra,* 441 U.S. at 696–703, 99 S.Ct. at 1957–1961. At the time of the President's 1962 Consumer Message, Congress had enacted a variety of express judicial provisions for the enforcement of statutory rights by the government. The President's Message itself referred to the power of the FTC to apply for cancellation of a trademark that "becomes the common descriptive name of an article or substance." *See* 15 U.S.C. § 1064 (1976 & Supp. V 1981); p. 778 *supra.* A number of other judicial provisions extant in 1962

view, the Court reasoned, "a victim of any crime would be deemed an especial beneficiary of the criminal statute's proscription." *Id.* at 294, 101 S.Ct. at 1779.

19. The Court in *Transamerica* examined section 215 of the Investment Advisors Act. Section 215 declared void contracts whose formation or performance would violate the Act. The Court stated:

By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract.

444 U.S. at 18, 100 S.Ct. at 246.

authorized the United States to bring civil enforcement actions in the district courts to enforce a number of regulatory statutes.[20]

Foreign to the jurisprudence of this period was the notion of implied rights of action in the United States to enforce statutory duties. *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the progenitor of the Court's formerly expansive view of private rights of action, came down several years after the enactment of section 135(c). *Wyandotte* followed even later. Although the Supreme Court's decision in *United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), to which the Court in *Wyandotte* referred, preceded the 1962 congressional term, *Republic Steel* would not have been authority for a right of action in the United States under section 135(c). *Republic Steel* relied on a provision which authorized the Department of Justice to "conduct the legal proceedings necessary to enforce" the Rivers and Harbors Appropriations Act of 1899. 362 U.S. at 491, 80 S.Ct. at 890. Section 135(c), by contrast, contains no provision authorizing any government enforcement.

Consequently, it cannot be said that the authors of section 135(c) acted against a contemporary legal backdrop which presumed that the government would be impliedly authorized to enforce statutes. It appears instead that Congress was fully cognizant of its power to authorize actions by the United States for the enforcement of statutory duties, and exercised that power on a variety of occasions. Our research discloses no basis for concluding that Congress had reason to believe that a right of action in favor of the United States would have been inferred by the courts in the absence of express statutory authorization.

D.

The legislative history of section 135(c) suggests that Congress intended the United States to have no right of action under the statute. First, although the President's Consumer Message proposed an expansion of the FTC's power to apply for cancellation of a trademark, the Message did not recommend a similar power in the Department of Justice to sue for invalidation of a patent. The FTC's power to seek a cancellation of a mark had been expressly conferred by statute, *see* Trademark Act of 1946, ch. 540, § 14(c), 60 Stat. 427, 433 (now codified at 15 U.S.C. § 1064 (Supp. V 1981)), as had other rights of action recognized on behalf of the United States at that time. *See* note 19 and p. 786, *supra.* Thus the President appears, perhaps advertently, to have proposed no right of action in the United States to enforce section 135(c). In view of the legislative history's indication that Congress intended section 135(c) to implement the President's recommendation, *see* p. 778 *supra,* his apparent decision not to authorize government enforcement may be imputed to Congress.

Second, Congress considered, but ultimately rejected, a proposal authorizing the United States to seek a $5000 penalty for the failure to comply with section 135(c). Representative Willis, who sponsored section 135(c), regarded such a penalty as inappropriate; enforcement should not, he ar-

---

20. *See* 15 U.S.C. §§ 4, 25 (1976) (authorizing Attorney General to sue to enjoin violations of the Sherman and Clayton Acts); 15 U.S.C. § 717s(a) (1976) (authorizing Federal Power Commission to sue to enjoin compliance with Natural Gas Act); 16 U.S.C. § 825m(a) (1976) (same for Federal Power Act); 15 U.S.C. § 53 (1976) (authorizing Federal Trade Commission to sue to enjoin violations of any law enforced by the Commission); 15 U.S.C. §§ 77t(b), 78u(d), 79r(g), 79y, 80a–35, 80a–41(e), 80a–43 (1976) (authorizing Securities and Exchange Commission to sue to enjoin compliance with a variety of laws within the Commission's jurisdiction); 33 U.S.C. § 413 (1976) ("[t]he Department of Justice shall conduct the legal proceedings necessary to enforce [certain provisions of the Rivers and Harbors Appropriation Act of 1899]"). *See also* Civil Aeronautics Authority Act of 1938, ch. 601, § 1007, 52 Stat. 973, 1025 (repealed by Federal Aviation Act of 1958, Pub.L. No. 85–726, § 1401(b), 72 Stat. 806) (authorizing Attorney General, on request of the Civil Aeronautics Board, to prosecute "all necessary proceedings for the enforcement of the provisions of this chapter"). The 1958 Federal Aviation Act continued to authorize the United States to collect any civil penalty imposed under the Act. *See* 49 U.S.C. §§ 1471, 1473 (1976 & Supp. V 1981).

gued, be accomplished by means of an "executive sanction." *See* note 9 *supra.* Significantly, the subcommittee itself explained that the additional deterrent value associated with an action by the government for a penalty would serve "no worthwhile purpose." *See* p. 779 *supra.*

Conceivably, the subcommittee could have reached this conclusion because it assumed that the United States already had available a far more powerful enforcement weapon: the right to sue for the invalidation of a patent. The cost of invalidation— here the patented product generates some $190 million in annual sales, *see* note 2 *supra*—dwarfs the proposed $5,000 fine. But it seems improbable that the subcommittee simply assumed the existence of such an important executive sanction. After having expressly considered and rejected the Justice Department's proposal to include a statutory "right of action in the United States" to penalize noncompliance with Section 135(c), *see* p. 779 *supra,* the subcommittee failed to specify any other executive sanction. This evidence suggests that if the subcommittee assumed anything, it assumed that statutory silence would entirely foreclose enforcement of section 135(c) by the United States.

## V.

Analysis of the first two *Cort* factors leads to the conclusion that Congress did not intend that the United States enforce section 135(c). Since neither the language nor legislative history of the provision suggests an intent to authorize enforcement by the government, it is not necessary to "trudge through all four of the [*Cort*] factors," *Merrill Lynch, supra,* 456 U.S. at 388, 102 S.Ct. at 1844, to decide that section 135(c) gives no implied right of action to the United States.

We are not unmindful of the government's contention that enforcement of section 135(c) would be strengthened if a cause of action were granted to the United States as well as to private plaintiffs. Patent litigation is very expensive and private parties generally will be unable to discover "secret" interference settlements without becoming involved in such litigation. Accordingly, there may be merit to the government's prediction that some patentholders will safely violate section 135(c) unless the United States is permitted to enforce the statute. But in view of the separation of powers concerns associated with judicially inferring a cause of action from a silent statute, and in view of the Supreme Court's restrictive approach to implied remedies since *Cort v. Ash,* the federal courts may no longer recognize an implied right of action solely because it would advance the purpose of a statute. *See California v. Sierra Club, supra,* 451 U.S. at 297–98, 101 S.Ct. at 1781. That decision is for Congress to make. If Congress desires that the United States play a role in the enforcement of section 135(c), it may so provide expressly. In the absence of an express provision, we decline to infer one now.

The order of the district court holding that the United States may sue to enforce section 135(c) will be reversed, and the case remanded to the district court with instructions to dismiss the complaint for failure to state a claim. In light of this decision, we do not reach the merits of the complaint.