### THE WILLIAM H. BAILEY.

(District Court, D. Connecticut. February 26, 1900.)

#### No. 1,209.

1. SHIPPING—MARITIME TORTS—INJURY TO OCEAN CABLE.

Evidence *held* to establish that an ocean cable was cut by the officers of a vessel whose anchor became entangled therewith.

2. SAME—LIABILITY OF VESSEL.

The anchor of a schooner became entangled in an ocean telegraph cable, and in order to release it the officers cut the cable. The schooner remained at the same place until the following morning. There was no reason why she could not have cut away the anchor when ready to proceed, having another anchor on board. There was testimony that the vessel was within anchorage grounds, and hence not guilty of negligence in becoming entangled, and the cable was lawfully laid and maintained where it was. *Held*, that in view of 25 Stat. c. 17, § 3, which provides that a cable shall be cut only when necessary to save life or limb or a vessel, and of article 7 of the treaty of 1884, which requires cable companies to reimburse vessel owners for anchors sacrificed to avoid injury to a cable, the officers must be held guilty either of willful injury to the cable, or culpable negligence, for which the vessel was liable.

In Admiralty. Libel in rem for a maritime tort.

Watrous & Day and W. W. Cook, for libelant.
James D. Dewell, Jr., and A. F. Cushman, for claimants.

TOWNSEND, District Judge. On December 29, 1898, at 18 minutes past 7 o'clock in the afternoon, the cable of the Commercial Cable Company ceased working. A test showed that the break was near the office of the company at New York, and on January 3d or 4th employés of said company located the break in Gowanus Bay, three miles from pier A, and one mile west of the Erie Basin. The amount claimed as damages for interruption of the cable service is $5,000. On the afternoon of said day, claimants' schooner, William H. Bailey, loaded with a cargo of coal, anchored near the point at which this cable was afterwards picked up and repaired. The captain and mate, the only witnesses for claimants, testify that they anchored on the anchorage grounds, and inside a red buoy near the navigation line. They further testify that in the afternoon a tugboat came to take them through Hell Gate, and found, after several efforts, that it could not stir the vessel. The tugboat then left, its captain agreeing to come back the next morning. They further testify that they then hauled up the anchor to the cathead, and found it was fast to what they described as an iron rope,— such a rope as is used on the rigging of vessels,—not more than an inch or an inch and a half in diameter, which, as they claim, was caught around the shank and over both flukes of the anchor. The cable of the Commercial Company, the severed portion of which was produced in court, was about 2½ inches in diameter. These witnesses testify that after working from about 5 o'clock in the afternoon until midnight, vainly endeavoring to disentangle this rope, they cut it with a meat saw, the operation taking about 10 minutes; that they then anchored for the night, and on the next morning proceeded on their journey. They further swear (the captain very vaguely, and the mate very positively) that libelant's cable is much larger than, and different in construction from, the rope which they cut, and which they describe as composed of small wire strands, less than 10 in number, each about an eighth of an inch in diameter, and wound about a core of Manilla rope.

The first question is whether the mate of the claimants' vessel, acting under the orders of the captain, cut said cable. Counsel for claimants contend that the facts shown are coincidences. Counsel for libelant contend that this is the best proof possible in cases of this character, where it is never practicable to secure witnesses to the actual cutting. That said cable was cut on December 29th at about a quarter past 7, when the men on the schooner were working on a cable or wire rope at or near the place where this cable was picked up, is proved. An inspection of the cable, in connection with the testimony of claimants' witnesses, and their log and saw, leads to the following conclusions: First, that claimants cut a cable, not a rope; second, that a cable of the size of libelant's cable could not have become twisted around the anchor in the manner the mate of the claimants' vessel testifies that the cable was twisted; third, that neither libelant's cable, nor the wire rope described by

the mate of claimants' vessel, could have been cut in two in 10 minutes with the small meat saw which they testify was used to effect the cutting; fourth, if the meat saw had been used for such a purpose, the teeth would have shown the effects thereof; fifth, if the wire rope had been the small strand rope with the Manilla core, which the mate says he cut, it could not possibly have taken the crew of seven men on board the vessel from 5 o'clock in the afternoon until midnight to get it off, nor is it probable that it would have withstood the great strain of the tugboat's vain efforts to stir the vessel. An expert introduced by the libelant showed by uncontradicted testimony that, in order to disentangle a cable from an anchor, it was only necessary to draw the anchor to the surface of the water so that the cable will be visible; then pass the bight of a rope underneath the cable, and take the rope to the bitt on deck, and lower the anchor gradually away from the cable; then release the rope, and allow the cable to fall back into the water again. If the cable which was cut was not libelant's cable, but the cable of some other corporation, it would have been a comparatively easy matter for the claimants, during all these months, to have found out what cable they had cut. In these circumstances, the conclusion reached is that the mate of claimants' vessel cut the cable.

The next question is whether the vessel is liable. The evidence on this point is that the night was calm and clear, that the vessel was only about a mile off shore, and that the tugboat had agreed to come back for it in the morning. If, as is contended by counsel for claimants, the vessel anchored within the anchorage grounds, they were not guilty of negligence in becoming entangled, but, becoming entangled, I think they should be held guilty either of willful injury or culpable negligence, for the following reasons: First. The statute (25 Stat. c. 17, § 3) provides that a cable shall be cut only when it becomes necessary in order to save life or limb or a vessel. Second. There would have been no difficulty in waiting, anchored as they were, until morning, and then cutting away the anchor when the tug came to take them on their course. Third. It appears from the testimony of the master that they had another anchor on board. Fourth. Article 7 of the treaty of 1884 provides that owners of such cables shall remunerate vessel owners who can prove that they have sacrificed an anchor in order to avoid injuring such cables. It was the custom of libelant to remunerate all vessel owners who lost anchors in such circumstances. In The Clara Killam, L. R. 3 Adm. & Ecc. 165, Sir Robert Phillimore held in such a case that "it was the duty of the ship to disentangle, if possible, her anchor from the cable without injuring it," and to take the necessary time therefor, "unless she thereby exposed herself to present or imminent peril," and that such a cable might have been cleared in the manner testified to by the expert for libelant herein; and he concluded that the cutting of the cable, in circumstances such as those here shown, was reckless and wrongful. In The City of Richmond (D. C.) 43 Fed. 85, affirmed in 8 C. C. A. 152, 59 Fed. 365, Judge Brown, and the court of appeals, affirming his decision, held that the telegraph company, having voluntarily selected a

place to lay their cables off the docks for years used by large steamers, had failed to show that in this crowded place the cables were so laid as not to obstruct navigation. In the case at bar, claimants do not contend that the libelant's cable was improperly laid. It was lawfully laid and maintained by virtue of its charter, the laws of the state of New York (Laws 1890, c. 566, § 102), and the treaty between the United States, Great Britain, and other nations (24 Stat. 989). Decree for libelant.