967 F.2d 864
 1992 A.M.C. 2492
 AMERICAN TELEPHONE & TELEGRAPH COMPANY; Federal Republic of
Germany, (Federal Ministry of Posts and Communications);
Regie Des Telegraphes et Des Telephones; Cyprus
Telecommunications Authority; Telefonica, S.A.; British
Telecom; Companhia Portuguesa Radio Marconi, S.A.; TRT
Telecommunications Corporation; FTC Communications, Inc.;
Teleglobe Canada Inc.; PTT Telecom B.V.; Posti-ja
Telelaitos; Televerket; Norwegian Telecommunications
Administration; Statens Teletjeneste; Bord Telecom
Eireann; Community of Yugoslav/PTT,
v.
M/V CAPE FEAR and M/V LITTLE GULL, their engines, boilers
fishing gear, etc., In Rem; and Gifford Marine,
Inc., In Personam,
Gifford Marine, Inc., Appellant.
 No. 91-5402.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 17, 1991.
Decided June 18, 1992.
 
 James F. Young (argued), Mary E. Reeves, Krusen, Evans & Byrne, Philadelphia, Pa., for appellant.
 Douglas R. Burnett (argued), Frances C. Peters, Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden, Newark, N.J., for appellees.
 Before: STAPLETON, SCIRICA and ROTH, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 In this case we are required to decide whether the Submarine Cable Act of 1888[1] provides an implied private right of action to owners of submarine cables that are damaged as a result of the negligent conduct of others. The district court held that it does. American Tel. & Tel. Co. v. M/V Cape Fear, 763 F.Supp. 97, 105 (D.N.J.1991). We will reverse.
 
 I.
 
 2
 The American Telephone & Telegraph Company is a member of a consortium that owns an international submarine telephone and communication cable known as TAT-7. This cable, which stretches across the bottom of the Atlantic Ocean from Tuckertown, New Jersey to Land's End, England, was severed on August 10, 1989. After detecting the break, the owners of the cable quickly dispatched an aircraft to the scene. The crew of the plane spotted the M/V Cape Fear and the M/V Little Gull within one half mile of the cable break, both dragging dredging-type fishing gear. Later inspection of the cable indicated that the damage was consistent with repeated contact with such dredging gear. No other ships capable of cutting the cable were seen in the area.
 
 
 3
 The consortium ("AT & T") filed suit in the United States District Court for the District of New Jersey. The complaint alleged that one or both of the defendant vessels had cut the cable in violation of United States maritime tort law, the Cable Act, international treaties, and customary international law. AT & T sought to recover the cost of repairing the cable (at that time estimated to be $1,500,000) and other consequential damages.
 
 
 4
 In response to AT & T's complaint, Gifford Marine, Incorporated, the owner of the M/V Cape Fear and the M/V Little Gull, filed two Complaints for Exoneration from or Limitation of Liability pursuant to the Limitation of Liability Act of 1851.[2] Gifford Marine contended that even if its ships had damaged the cable, its liability should be limited to the value of the two vessels at the time of the incident: $1,090,000. AT & T responded that the Cable Act and international law superseded the Limitation Act, and that its total damages had increased to $3,500,000. After consolidation of the two suits, AT & T moved for judgment on the pleadings to determine whether, among other things, the defendants' liability under the Cable Act, if any, would be circumscribed by the Limitation Act. The district court held that the Cable Act, which explicitly provides for criminal prosecution, also supplies an implied private civil right of action to aggrieved cable owners. The district court also held that because the later Cable Act impliedly repealed the earlier Limitation Act, any civil liability available under the Cable Act would not be limited. The district court granted AT & T's motion for judgment on the pleadings, and this appeal followed.[3] Because we hold that the Cable Act provides no private cause of action, we will reverse.[4]
 
 II.
 
 5
 The primary source of a private right of action is the text of a statute. Because the Cable Act does not expressly confer a private right on cable owners, we must decide whether one may be implied. Implication of private rights of action may "alter the remedial scheme devised by Congress for the enforcement of statutory programs and ... place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature." United States v. FMC Corp., 717 F.2d 775, 780 (3d Cir.1983). For this reason, the crucial question is whether Congress intended to create such a right. California v. Sierra Club, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). This is "basically a matter of statutory construction." Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). The Supreme Court has set forth a four-part inquiry:
 
 
 6
 First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 7
 Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted) (emphasis in original).
 
 
 8
 The first two criteria are critical. If they do not point toward a private right, the remaining two "cannot by themselves be a basis for implying a right of action." Touche Ross & Co. v. Redington, 442 U.S. 560, 580, 99 S.Ct. 2479, 2491, 61 L.Ed.2d 82 (1979) (Brennan, J., concurring). By the same token, if the statute and legislative history reveal congressional intent to create a right of action, "there is no need ... to 'trudge through all four of the factors.' " Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982). This emphasis on the first two factors has severely weakened the once-prevailing view that a cause of action will be implied if existing statutory remedies are inadequate to fulfill the purpose of the statute. See generally FMC Corp., 717 F.2d at 782-83.
 
 A.
 
 9
 The initial question is whether the Cable Act was enacted for the benefit of a special class of which AT & T is a member. Cannon v. University of Chicago, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). "That question is answered by looking to the language of the statute itself." Id. Language explicitly conferring a right directly on a class of persons indicates that Congress intended to establish a cause of action on behalf of members of the class. FMC, 717 F.2d at 781. On the other hand, when a statute imposes a duty without an "unmistakable focus" on the benefitted class, the courts are reluctant to infer a remedy. Id.
 
 
 10
 The Cable Act provides no explicit private damage remedy and is primarily criminal in nature. Under the Act it is a misdemeanor to "willfully and wrongfully break or injure, or attempt to break or injure, or ... in any manner procure, counsel, aid, abet, or be accessory to such breaking or injury, or attempt to break or injure, a submarine cable" in a way that "interrupt[s] or embarrass[es]" telegraphic communication. 47 U.S.C. § 21. It is also a misdemeanor to inflict the same injury "by culpable negligence." Id. § 22.[5] It would appear, then, that the statute "states no more than a general proscription of certain activities; it does not unmistakably focus on any particular class of beneficiaries whose welfare Congress intended to further." Sierra Club, 451 U.S. at 294, 101 S.Ct. at 1779. The existence of criminal penalties does not, however, necessarily preclude implication where there may be other indications of congressional intent to create a private cause of action. Cort v. Ash, 422 U.S. at 79, 95 S.Ct. at 2088.
 
 
 11
 AT & T contends that two sections of the Cable Act indicate that Congress intended to permit private suits. The first, § 28, states that "[t]he penalties provided in this chapter for the breaking or injury of a submarine cable shall not be a bar to a suit for damages on account of such breaking or injury." 47 U.S.C. § 28. The district court held that this section merely prevents the express criminal penalties contained in the Cable Act from prohibiting a civil remedy. We agree.
 
 
 12
 In Bloomer Shippers Ass'n v. Illinois Central Gulf Railroad Co., 655 F.2d 772, 778 (7th Cir.1981), the Court of Appeals for the Seventh Circuit concluded that similar language, standing alone, does not indicate that Congress intended to create a private federal cause of action. In that case, Illinois Central pleaded guilty to a criminal charge of violating § 41(1) of the Interstate Commerce Act. After entry of the plea, a group of its customers filed a civil suit against the railroad, contending that they possessed an implied civil right of action under both § 41 and § 43. Among other things, § 43 stated that:
 
 
 13
 [T]he proceedings provided for by sections 41, 42, or 43 of this title shall not preclude the bringing of suit for the recovery of damages by any party injured, or any other action provided by said Act ...
 
 
 14
 655 F.2d at 778 (quoting former 49 U.S.C. § 43 (repealed)).
 
 The court held that this language was
 
 15
 of no assistance to plaintiffs because it does not create a private cause of action but merely establishes that government enforcement proceedings do not bar injured parties from bringing authorized damage suits. In short, a plaintiff must find a private remedy elsewhere (e.g., [in statutes expressly providing a civil cause of action] before invoking the protection of the language in Section 43.
 
 
 16
 Id.
 
 
 17
 We find this rationale convincing. Section 28 of the Cable Act recognizes the possibility that an aggrieved cable owner may want to obtain civil redress from one who has violated the statute's criminal prohibitions. However, it neither endorses nor discourages civil suits. Instead, it simply establishes that the Cable Act's criminal regime does not bar injured plaintiffs from bringing civil damage actions. Cf. Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 15-16, 101 S.Ct. 2615, 2623-24, 69 L.Ed.2d 435 (1981) (Federal Water Pollution Control Act's statement that nothing in its citizen-suit provision "shall restrict any right which any person ... may have under any statute or common law to seek enforcement ... or any other relief" does not support implication of private right). Accordingly, § 28 does not imply a private right of action.
 
 
 18
 AT & T also relies upon § 33 of the Cable Act, which provides that the district courts "shall have jurisdiction over all offenses against this chapter and of all suits of a civil nature arising thereunder." 47 U.S.C. § 33 also defines the venue for criminal prosecutions, and provides that "suits of a civil nature may be commenced in the district court for any district within which the defendant may be found and shall be served with process." Resting its decision in part on legislative history, the district court found this language indicated congressional intent to facilitate private suits by cable owners. The district court found that "the phrase 'civil actions arising thereunder' must refer to implied rights, because there are no other clauses expressly providing for such actions." We disagree.
 
 
 19
 The Supreme Court addressed a similar argument in Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). In that case, the accounting firm of Touche Ross & Company audited the books of a securities brokerage firm and prepared annual reports of the firm's financial condition. Id. at 563-66, 99 S.Ct. at 2482-84. When the brokerage firm became insolvent, the Securities Investor Protection Corporation and an appointed Trustee sought to hold Touche Ross liable for alleged breaches of recordkeeping duties imposed by § 17(a) of the Securities Exchange Act of 1934. After the Court rejected the plaintiffs' argument that § 17(a) was the source of a private right of action, it addressed the plaintiffs' contention that under the Court's earlier decision in J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), one could be implied from the "remedial purposes" of the statute and from its jurisdictional provision, § 27. Id. at 576-77, 99 S.Ct. at 2489-90. This section provided that the "district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." Id. at 576 n. 17, 99 S.Ct. at 2489 n. 17 (quoting 15 U.S.C. § 78aa).
 
 
 20
 The Supreme Court rejected this argument as well, noting that § 27
 
 
 21
 grants jurisdiction to the federal courts and provides for venue and service of process. It creates no cause of action of its own force and effect; it imposes no liabilities. The source of plaintiffs' rights must be found, if at all, in the substantive provisions of the 1934 Act which they seek to enforce, not in the jurisdictional provision.
 
 
 22
 Id. at 577, 99 S.Ct. at 2490. After noting that it was not questioning "the actual holding" of Borak (which had found the same language "sufficient to fashion a remedy," see 377 U.S. at 433, 84 S.Ct. at 1560), the Court nevertheless declined to read Borak "so broadly that virtually every provision of the securities Acts gives rise to an implied private cause of action." 442 U.S. at 577, 99 S.Ct. at 2490. The court also refused to base implication of a private right of action on the "remedial purposes" of the 1934 Act: "Certainly, the mere fact that § 17(a) was designed to provided protection for brokers' customers does not require the implication of a private damages action in their behalf." Id. at 578, 99 S.Ct. at 2490. Borak, concluded the Court, was simply out of step with the "stricter standard" now in force. Id.
 
 
 23
 We believe that Touche Ross forecloses implication of a private right of action from § 33 of the Cable Act. Section 33 covers nothing more than jurisdiction, venue, and service of process. It creates no cause of action of its own force and effect, and imposes no liabilities. Therefore, we cannot endorse the district court's view that the jurisdictional language in § 33 "may be evidence of legislative intent to provide such a right." Cf. Zeffiro v. First Pa. Banking & Trust Co., 623 F.2d 290, 294 (3d Cir.1980) (holding that provision of Trust Indenture Act of 1939 granting federal courts jurisdiction to "enforce any liability created by ... this subchapter" does not expressly authorize a private cause of action), cert. denied, 456 U.S. 1005, 102 S.Ct. 2295, 73 L.Ed.2d 1299, Reh'g. Denied, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982).
 
 
 24
 AT & T appears to argue that Touche Ross applies only to statutes, like the Securities Exchange Act of 1934, that contain explicit private causes of action elsewhere in the statute. According to AT & T, this limitation is set forth in the Court's comment that when Congress desired to furnish a private right of action, it knew how to do so and did so "expressly." 442 U.S. at 572, 99 S.Ct. at 2487. That comment, however, was merely additional justification for the Court's decision not to imply a private right of action from § 17(a), which was not only silent on a private right, but was also "flanked by" sections containing explicit causes of action. Id. at 571, 99 S.Ct. at 2486; see William V. Luneburg, Justice Rehnquist, Statutory Interpretation, the Policies of Clear Statement, and Federal Jurisdiction, 58 Ind.L.J. 211, 255 (1982). Therefore, the fact that the 1934 Act, unlike the Cable Act, already provided explicit remedies does not preclude reliance upon the Touche Ross Court's discussion of jurisdictional language.
 
 
 25
 AT & T also contends that Touche Ross is distinguishable because §§ 17(a) and 27 of the 1934 Act, unlike the Cable Act, "did not proscribe any conduct as unlawful." Yet Touche Ross made no distinction between civil and criminal provisions. Nor are we persuaded that the distinction matters: criminal and civil statutes both impose duties to refrain from specified conduct. Congress punishes breaches of duties embedded in criminal statutes, but punishment does not require implication of a private enforcement remedy in every instance. If it did, "a victim of any crime would be deemed an especial beneficiary of the criminal statute's proscription." Sierra Club, 451 U.S. at 294, 101 S.Ct. at 1779.
 
 
 26
 Finally, AT & T attempts to distinguish Touche Ross by emphasizing, without explanation, that § 27 of the 1934 Act referred to all suits in equity and all actions "brought to enforce any liability or duty." We do not see why the absence of this language from the Cable Act should require implication of a private right of action here. All suits, whether civil or criminal, involve enforcement of a liability or duty.
 
 
 27
 Under Touche Ross, then, a private right of action must be found in the substantive provisions of the statute. We find that nothing in the text of the Cable Act indicates congressional intent to "confer federal rights upon" the cable owners.[6] Sierra Club, 451 U.S. at 294, 101 S.Ct. at 1779.
 
 
 28
 AT & T contends, however, that the Cable Act reveals that cable owners are the "especial beneficiaries" of the statute, and that a private right must be implied for their benefit. We disagree. Because a statute rarely names its beneficiaries, it is often difficult to determine whether Congress meant to benefit a "special class" of beneficiary or "the general public." In Cort v. Ash, the Supreme Court held that in the absence of an explicit right of action, one may be implied only if there is either a "clearly articulated federal right in the plaintiff" or a "pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard." 422 U.S. at 82, 95 S.Ct. at 2090. Neither exists here.
 
 
 29
 While we agree that Congress must have intended to benefit cable owners when it passed the Cable Act, we note that the statute does not clearly and exclusively articulate a right in that particular class of plaintiff. Indeed, as the district court noted, the Cable Act can also be read as benefitting all consumers of telecommunication services, i.e., the general public. See 763 F.Supp. at 107 (the "overriding purpose of the Cable Convention is to safeguard communication between nations which is vital for international security and commerce and is clearly advantageous to the public at large"). Moreover, there is some--albeit weak--support in the legislative history for the notion that the Act was intended to benefit the United States government.[7] It is certainly possible that Congress intended to benefit all these interests. In recent years, however, the Supreme Court has implied private rights of action only when Congress has unambiguously described the particular class upon which it intended to confer such a right. See, e.g., Cannon, 441 U.S. at 689-90, 99 S.Ct. at 1953-54 (noting that Voting Rights Act of 1965 and Federal Safety Appliance Acts of 1893, 1903, and 1910 explicitly defined or characterized class of plaintiffs). We cannot say, then, that the Cable Act clearly articulates a federal right in anyone other than the executive branch, which may initiate criminal prosecutions.
 
 
 30
 We also note that the Cable Act does not specifically define a federal "right" upon which the cable owners could sue. As an example of a clearly articulated federal right, Cort v. Ash cited to Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Bivens held that the Fourth Amendment, which explicitly declares that people have a "right ... to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. art. IV (emphasis added), implied a private cause of action against federal agents who violate this federal constitutional right. The Cable Act, however, does not affirmatively articulate an underlying federal right. Rather, it merely states that "[n]o right shall accrue to any government, person, or corporation under the terms of sections 34 to 39 [pertaining to licensure] that may not be rescinded, changed, modified, or amended by the Congress." 47 U.S.C. § 39. This provision is also significant because it demonstrates that Congress knew how to create and manipulate private rights within the Cable Act. Therefore, we find that the Cable Act articulates no federal "right" in the cable owners.
 
 
 31
 Nor is the Cable Act a "pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard." 422 U.S. at 82, 95 S.Ct. at 2089. In J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the case cited to illustrate this concept in Cort, the Supreme Court held that private parties had a right to bring suit for violation of § 14(a) of the Securities Exchange Act of 1934 and its attendant regulations, which proscribe false or misleading proxy statements. One factor supporting implication of a private right of action was the pervasive nature of the 1934 Act's regulation of the relationship of shareholder to corporation. The Cable Act, however, does not comprehensively address--or even specifically govern--the relationship of cable owners to ship owners or transactions between the two. Thus, in view of the lack of the pervasive regulation and clearly articulated federal right required by Cort v. Ash, we find that the Cable Act is not a law enacted for the benefit of a special interest group.
 
 B.
 
 32
 We next look at the legislative history of the Cable Act. FMC Corp., 717 F.2d at 783. Unfortunately, there is scant legislative history and little printed record of the evolution of the statute. After the bill was reported from the House Committee on Foreign Affairs, Representative Daniel explained on the House floor that the bill was "simply an undertaking on the part of the United States Government to fulfill its part of [the International Convention for the Protection of Submarine Cables] by providing penalties for infringement upon or injury done to submarine cables." 18 Cong. Rec. 1514 (Feb. 8, 1887). After certain amendments, the bill passed and was enacted in February, 1888. 19 Cong. Rec. 1403-04 (Feb. 29, 1888); 25 Stat. 41 (1888). We have not found--nor have the parties cited to--any recorded discussion of a private remedy like that sought by AT & T.
 
 
 33
 Although there is no support for a private remedy in the text or legislative history of the Cable Act, AT & T insists that because courts frequently inferred private rights of action from criminal statutes in the nineteenth century, we should presume that Congress expected the courts to do so here.[8] It is true, as the Supreme Court has noted, that:
 
 
 34
 [w]hen federal statutes were less comprehensive, the Court applied a relatively simple test to determine the availability of an implied private remedy. If a statute was enacted for the benefit of a special class, the judiciary normally recognized a remedy for members of that class. Under this approach, federal courts, following a common-law tradition, regarded the denial of a remedy as the exception rather than the rule.
 
 
 35
 Merrill Lynch, 456 U.S. at 374-75, 102 S.Ct. at 1837 (citing Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916)). The classic statement of this doctrine appears in Rigsby, where the Court declared that:
 
 
 36
 [a] disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute is enacted, the right to recover the damages from the party in default is implied ... 'So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law.'
 
 
 37
 241 U.S. at 39, 36 S.Ct. at 484 (citation omitted).[9] This approach prevailed throughout the 1800s, Merrill Lynch, 456 U.S. at 375 & n. 54, 102 S.Ct. at 1837 & n. 54, and was in force when the Cable Act was passed.
 
 
 38
 As Cort v. Ash and many succeeding cases demonstrate, however, the Supreme Court has consistently applied contemporary implication precepts to statutes enacted at a time when implication was the rule rather than the exception.[10] See, e.g., Sierra Club, 451 U.S. 287, 101 S.Ct. at 1775 (Rivers and Harbors Act of 1889). This significant shift in legal doctrine occurred in large part because of the Supreme Court's concerns about burdening the federal courts, the quality of Congress's work product, and the sheer bulk of federal legislation. National Sea Clammers, 453 U.S. at 24-25, 101 S.Ct. at 2628-29 (Stevens, J., concurring); see generally H. Miles Foy, Some Reflections on Legislation, Adjudication, and Implied Private Actions in the State and Federal Courts, 71 Corn.L.Rev. 501, 548-64 (1986) (describing rejection of earlier approach). In other words, "[t]he slate ... is not clean." Sierra Club, 451 U.S. at 301, 101 S.Ct. at 1783 (Stevens, J., concurring). We are bound to the rules of implication set forth in and after Cort v. Ash, and may not decide this case on our view of "what Congress probably assumed" when it passed the Cable Act. Id. Therefore, we cannot follow the relaxed implication practices of our nineteenth century forebears.
 
 
 39
 AT & T also contends that we should glean intent to provide a private cause of action from the fact that Congress legislated against a legal background that included the United States' ratification of the Cable Convention. The Supreme Court in the past has implied private causes of action where Congress, after a "consensus of opinion concerning the existence of a private cause of action" had developed in the federal courts, has amended a statute without mentioning a private remedy. Merrill Lynch, 456 U.S. at 380, 102 S.Ct. at 1840. In this circumstance, Congress is deemed to have acquiesced in or consented to the "contemporary legal context." Id. at 381, 102 S.Ct. at 1841; see Touche Ross, 442 U.S. at 577 n. 19, 99 S.Ct. at 2486 n. 10 (stating that the Court's implication of a private right under § 10(b) of 1934 Act was simply acquiescence in "the 25-year-old acceptance by the lower courts of an implied action"). Cf. Polaroid Corp. v. Disney, 862 F.2d 987, 995 (3d Cir.1988). See also Bruce A. Boyer, Howard v. Pierce: Implied Causes of Action and the Ongoing Vitality of Cort v. Ash, 80 Nw.U.L.Rev. 722, 742-43 (1985) (noting that inquiry into legislative context can supplement analysis of the Cort v. Ash factors). AT & T argues that we should interpret Congress's failure, when it passed the Cable Act, to include two civil causes of action explicitly outlined in the Cable Convention--namely Article 4 (which states that a person who damages a cable when repairing or laying a second cable must pay the cost of repairs and any other civil or criminal claim) and Article 7 (which indemnifies owners of ships who deliberately lose an anchor or fishing gear to avoid damaging a cable)--as an acknowledgement that the Cable Act would be the basis of all civil actions.[11] The district court accepted this view, holding that these omissions were evidence that Congress "decided not to specify certain civil damage claims and intended that all types of civil suits for damages would be brought pursuant to the Act." Because Congress consciously chose not to grant the Cable Convention's explicit causes of action, the argument goes, we should imply a civil remedy.
 
 
 40
 We reach a different conclusion over Congress's decision to omit these and other private causes of action. The Supreme Court has commented that "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." Touche Ross, 442 U.S. at 571, 99 S.Ct. at 2486. Here the legislative history is mute on whether the courts should supplement the extant criminal prohibitions with a civil cause of action. In this case, we decline to clothe Congress's silence with substantive meaning. See generally William N. Eskridge, Interpreting Legislative Inaction, 87 Mich.L.Rev. 67, 84-89 (1988).
 
 
 41
 The general argument that the historical background to the passage of the Cable Act should result in implication is also weakened because civil redress was already available in the federal courts when the statute was passed. Maritime law is one of the few substantive areas of the law where there has long been an extensive and growing body of federal common law. "A narrow exception to the limited lawmaking role of the federal judiciary is found in admiralty." Northwest Airlines, Inc. v. Transport Workers Union, 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). The Supreme Court has "consistently ... interpreted the grant of general admiralty jurisdiction to the federal courts as a proper basis for the development of judge-made rules of maritime law." Id. at 95-96, 101 S.Ct. at 1582-83. Maritime common law has governed collision (between two ships) and allision (between a ship and a stationary object) for many years. See, e.g., The Great Western, 118 U.S. 520, 6 S.Ct. 1172, 30 L.Ed. 156 (1886); The Belgenland, 114 U.S. 355, 369, 5 S.Ct. 860, 866, 29 L.Ed. 152 (1885) (upholding federal jurisdiction over collision between vessels on the high seas and applying "the general maritime law"); The Benefactor, 103 U.S. 239, 26 L.Ed. 351 (1880); Knight v. Stone, 14 F.Cas. 778 (D.Mass.1826) (No. 7,888); Stone v. Ketland, 23 F.Cas. 156 (C.C.D.Pa.1804) (No. 13,483). See generally Thomas F. Schoenbaum, Admiralty and Maritime Law § 13-1 at 444 (1987); Grant Gilmore & Charles L. Black, The Law of Admiralty, 485-531 (2d ed. 1975); David R. Owen, The Origins and Development of Maritime Collision Law, 51 Tul.L.Rev. 759 (1977).
 
 
 42
 Although our research has uncovered only three pre-1888 cases involving damage to submarine cables, they demonstrate that common law negligence principles were applied before the passage of the Cable Act. See, e.g., The Carl Frederick, 33 F. 589, 591 (N.D.Cal.1887) (master of vessel is bound to the "exercise of reasonable care and nautical skill to avoid or mitigate its injurious consequences" and "that degree of professional skill which reasonably may be exacted of a ship-master"); Stephens & C. Transp. Co. v. Western Union Tel. Co., 22 F.Cas. 1301, 1302 (E.D.N.Y.1876) (No. 13,371) (ship crew is "bound to apply ordinary skill" in disentangling propeller from telegraph cable) (quoting English case); and Blanchard v. Western Union Tel. Co., 60 N.Y. 510, 517 (1875) (noting that had members of crew run their boat "knowingly and rashly into danger foreseen or known to them, the case would be different" because of possible assumption of the risk). The negligence principles discussed in these domestic cases[12] were also applicable in international submarine cable cases. At that time, as now, "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, [was] of admiralty cognizance." The Plymouth, 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1865). Indeed, just six years before the passage of the Cable Act, the Supreme Court held that general maritime tort law affords redress for "wrongs suffered in consequence of the negligence or malfeasance of others, where the remedy at common law is by an action on the case." Leathers v. Blessing, 105 U.S. 626, 630, 26 L.Ed. 1192 (1881). Thus, in 1888 an aggrieved owner of an international submarine cable was able to employ negligence theory when suing for damages.
 
 
 43
 In light of this tradition, it appears that in 1888 the cable owners were protected by general maritime common law, and that a supplementary statutory remedy was not essential to private recovery. The Cable Act's jurisdictional provision, which stated that the statute was no "bar" to "civil actions," simply ensured that the statute would not preempt existing common law remedies, which was the prevailing practice. See Laurence H. Tribe, American Constitutional Law 491 (2d ed. 1988) ("It was once thought that, when the federal government regulated a given subject, any state law which purported to govern the same area was invalid.").
 
 
 44
 As the Court stated in Touche Ross, "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." 442 U.S. at 572, 99 S.Ct. at 2487. To be sure, the courts were more receptive to implication of private rights of action in the nineteenth century. Nevertheless, Congress must have been aware in 1888 that civil remedies existed. The same was true in 1921, when Congress amended the Cable Act to add a civil injunctive remedy. 47 U.S.C. § 36. On both occasions, Congress omitted the civil remedy sought here.
 
 
 45
 Because we find that the text and legislative history of the Cable Act contain little, if any, evidence of congressional intent to provide for an implied right of action, we hesitate to "trudge through" the remaining parts of the Cort v. Ash analysis. Since, however, the district court relied so heavily upon fulfillment of the purpose of the Cable Act, we shall address the issue.
 
 C.
 
 46
 As we noted in FMC, "[t]he cases following Cort make clear that the apparent necessity of an implied private remedy will not justify its recognition unless Congress intended to authorize it." 717 F.2d at 783. Indeed, the Supreme Court has strongly hinted that fulfillment of a statute's purpose is entitled to substantially less weight than the text and legislative history of a statute. Touche Ross, 442 U.S. at 575-76, 99 S.Ct. at 2489.
 
 
 47
 The parties here do not directly address whether a private right of action would frustrate the underlying purpose of the Cable Act, perhaps because it is not clear that the Act has a single or "primary" purpose. Cort v. Ash, 422 U.S. at 81-82, 95 S.Ct. at 2089-90. The district court felt that "[t]he overriding purpose of the Cable Convention [and presumably the Cable Act] is to safeguard communication between nations." AT & T argues that the Cable Act was meant to protect and compensate cable owners. But one could also plausibly argue that the statute is designed to protect the interests of the general public. It is difficult to see how a private right of action would frustrate any one of these goals. Indeed, such a right would very likely be "consistent with the [Cable Act's] underlying purposes." Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2088.
 
 
 48
 At the same time, we are not convinced that the omission of an implied right of action would, as AT & T appears to argue, necessarily make it impossible to attain these goals. The district court held that the purpose of the Cable Act, at least as it had been defined, would be accomplished "only by providing a civil remedy for those with the most immediate interest in the safety of the cables--their owners." Id. We are not so certain that implication of a private right of action in these cable owners is the only way to ensure that any one of the statute's possible goals is accomplished. As AT & T concedes, the cable owners possess a common law right of action. See Transcript of Oral Argument at 12, 14. An implied private right of action therefore is not the only way to protect the purposes of the Cable Act.
 
 
 49
 It is hard to tell whether the Cable Act has deterred damage to submarine cables. There are cases of such damage, and some mention the Cable Act. Not one, however, creates or relies on a private cause of action derived from the Cable Act.[13] If, during the last 104 years, the Cable Act had been a critical source of protection to the cable owners, one might expect to find at least one reported decision in which a cable owner had advanced--with or without success--a private cause of action based on the statute. Of course, there may have been cases during the last century that were settled, discontinued, or simply not reported. Given the expense of installing and maintaining international cables, we do not believe that the cable owners (who must certainly have been aware of the statute) would have given up so easily on a promising avenue of recovery, especially in view of the possibility that recovery under a common law cause of action might be subject to the constraints of the Limitation of Liability Act.[14] The fact that this case is the first to address the issue is at least some indication that the Cable Act has not, since its enactment, played a significant role in guarding the financial interests of cable owners.
 
 
 50
 In reaching its conclusion that telecommunication would be unprotected in the absence of a civil remedy for cable owners, the district court placed great reliance upon Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), a case decided before Cort v. Ash. In that case, the Supreme Court held that the Rivers and Harbors Act of 1899 provided a civil cause of action to the federal government against owners of sunken vessels, even though the statute was largely penal in nature. Id. at 200-201, 88 S.Ct. at 385-86. We believe that Wyandotte does not support implication of a private right of action from the Cable Act.
 
 
 51
 The Rivers and Harbors Act provided criminal penalties for owners who refused to remove their sunken vessels from navigable channels. It also charged the federal government with ensuring that the waterways were kept clear. Id. at 197-98, 88 S.Ct. at 383-84; 33 U.S.C. §§ 409, 411, & 414. The United States, after averting a catastrophe by removing a sunken vessel, sued the vessel's owner for the cost of removal. The Supreme Court held that the absence of an express private right of action did not prevent a civil suit, reasoning that the criminal penalties were inadequate to ensure full effectiveness of the statute. Id. at 201-03, 88 S.Ct. at 385-87. In rejecting the view that the government's remedies were limited to those stated in the Act (i.e., recovery of the scrap value of the sunken vessel), the Court stated that the government was "a principal beneficiary, if not the principal beneficiary" of the Rivers and Harbors Act. Id. at 201, 88 S.Ct. at 385. Denial of a civil remedy would permit "the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim." Id. at 204, 88 S.Ct. at 387. The wrongful owner would enjoy "a personal civil immunity from the consequences of [his] crime." Id. at 207, 88 S.Ct. at 388.
 
 
 52
 There are two central reasons for rejecting the analogy to Wyandotte. First, as we noted in FMC, in the post-Cort era it is questionable whether Wyandotte permits courts to infer a right of action simply because statutory remedies may be inadequate. 717 F.2d at 782-83. There is no better example of this trend than Touche Ross, where the Court placed no weight at all upon "generalized references to the 'remedial purposes' of the 1934 Act." 442 U.S. at 577, 99 S.Ct. at 2490. In Touche Ross, the Court emphasized that "the mere fact that [the statute] was designed to provide protection for [the plaintiffs] does not require the implication of a private damages remedy in their behalf." Id. at 578, 99 S.Ct. at 2490. AT & T's references to fulfillment of the purposes of the Cable Act are no less general. Therefore, assuming that Congress intended in some measure to benefit the cable owners, Touche Ross counsels strongly against implication of a private cause of action. Cf. United States v. City of Philadelphia, 644 F.2d 187, 191-92 (3d Cir.1980) (noting that Wyandotte analysis had been significantly cut back by subsequent Supreme Court decisions).
 
 
 53
 It is also significant that in Sierra Club, decided fourteen years after Wyandotte, the Supreme Court rejected a private cause of action for non-governmental parties under § 10 of the Rivers and Harbors Act largely because the Court felt the statute was intended to benefit "the public at large by empowering the Federal Government to exercise its authority over interstate commerce." Sierra Club, 451 U.S. at 294-95, 101 S.Ct. at 1779-80. According to the Court, the Rivers and Harbors Act was passed in response to an earlier Court decision that no federal common law prohibited obstructions and nuisances in navigable rivers. Id. at 295, 101 S.Ct. at 1780 (citing Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888)). Here, by contrast, the cable owners may bring a common law negligence action against the defendants. Because we are not faced with a plaintiff who has no other remedy, analogies to the Rivers and Harbors Act, and to Wyandotte, are not convincing. Therefore, to the extent that the purposes of the Cable Act are discernable, they will not necessarily be thwarted if the cable owners are not able to sue under the statute.
 
 D.
 
 54
 The final inquiry under Cort is whether "it would be inappropriate to infer a cause of action based solely on federal law" because the sought-after cause of action is traditionally relegated to "state law, in an area basically the concern of the States." 422 U.S. at 78, 95 S.Ct. at 2088. As we have already pointed out, admiralty law is generally committed to the jurisdiction of the federal courts. U.S. Const. art. III, § 2; 28 U.S.C. § 1333; 46 U.S.C. § 740 ("The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water...."). The only real question is whether the federal courts will entertain a federal common law cause of action or one based on the Cable Act. Therefore, infringement on the domain of the state courts is irrelevant here.
 
 III.
 
 55
 Our review of the text, legislative history, and purpose of the Cable Act leads us to conclude that Congress did not intend to create a private right of action in addition to the express enforcement provisions of the statute. Therefore, we will reverse the judgment of the district court and remand for reconsideration of whether AT & T's remaining claims are subject to the Limitation of Liability Act.[15]
 
 
 
 [1]
 Ch. 17, 25 Stat. 41 (1888) (codified as amended at 47 U.S.C. §§ 21-39 (1988)). The Submarine Cable Act incorporated much of the International Convention for the Protection of Submarine Cables ("the Cable Convention"), March 14, 1884, 24 Stat. 989-1000; Dec. 1, 1886, 25 Stat. 1424; July 7, 1887, 25 Stat. 1425; 1 Bevans 89, 112, 114
 
 
 [2]
 Ch. 43, 9 Stat. 635 (1851) (codified as amended at 46 U.S.C. §§ 181-95 and Supp.Fed.R.Civ.P. F). Under the Limitation of Liability Act, the liability of a vessel owner for "any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner ..., shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C. § 183(a)
 
 
 [3]
 We have jurisdiction under 28 U.S.C. § 1292(a)(3) (1988)
 
 
 [4]
 We have plenary review of the district court's interpretation and construction of the Submarine Cable Act. Dawson v. United States, 894 F.2d 70, 72 (3d Cir.1990)
 
 
 [5]
 Other misdemeanors defined in the Cable Act are certain navigational errors, id. §§ 24, 25; failure to present official papers on demand to officers of ships, id. § 27; and installation or operation of a submarine cable without a license. Id. §§ 34, 37
 
 
 [6]
 AT & T contends that because the first bill considered by the House stated that the district courts "shall have jurisdiction of all suits of a civil nature arising under this act," H.R. 9324, 49th Cong., 1st Sess. (1886) (emphasis supplied), we should reach a different conclusion. In light of Touche Ross, we doubt whether it is proper to discern congressional intent from jurisdictional provisions. In any event, the legislative history cited by AT & T does not clearly favor the cable owners. The transformation of "arising under this act" to "arising thereunder" could be read as evidence that Congress rejected the notion that the Cable Act itself would support private lawsuits
 
 
 [7]
 In exhorting members of the House to pass the pending bill so the United States could join other signatories to the Cable Convention, Representative Norwood urged that "we are now upon the eve of the period when, if we do not act, the United States will lose the benefits that are to be derived from the Convention." 19 Cong. Rec. 1446 (Feb. 24, 1888)
 
 
 [8]
 Here our initial focus is on "Congress' perception of the law that it was shaping or reshaping." Merrill Lynch, 456 U.S. at 378, 102 S.Ct. at 1839. We examine "not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." Id. n. 61 (quoting Brown v. GSA, 425 U.S. 820, 828, 96 S.Ct. 1961, 1965, 48 L.Ed.2d 402 (1976))
 
 
 [9]
 Implied remedies were not, however, recognized where the statute in question was "a general regulatory prohibition enacted for the benefit of the public at large." Merrill Lynch, 456 U.S. at 376, 102 S.Ct. at 1838
 
 
 [10]
 The Supreme Court's recent decision in Franklin v. Gwinnett County Public Schools, --- U.S. ----, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), is not to the contrary. Franklin concerned the remedies available under an existing implied private right of action. As the Court noted, "the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place." Id. at ----, 112 S.Ct. at 1032 (quoting Davis v. Passman, 442 U.S. 228, 239, 99 S.Ct. 2264, 2273, 60 L.Ed.2d 846 (1979)). See also id. at ----, 112 S.Ct. at 1037 ("Unlike the finding of a cause of action, which authorizes a court to hear a case or controversy, the discretion to award relief involves no such increase in judicial power.")
 
 
 [11]
 AT & T does not argue that there was a judicial consensus "concerning the existence of a private cause of action" when the Cable Act was passed. One could argue that when Congress amended the Cable Act in 1921 and 1928 it legislated against a legal background that included reported decisions mentioning the statute. As we explain below, however, these decisions neither create nor refer to a private right of action. For this reason, we discern no consensus at these times
 
 
 [12]
 AT & T maintains that "domestic" cable cases are inapposite because the Cable Act could not have applied to domestic cables. Although we do not resolve this issue, we note that the Cable Act, which expressly covers "only ... cables to which the [International Convention for the Protection of Submarine Cables] for the time being applies," 47 U.S.C. § 32 (1988), would seem to apply if (1) the cable is "landed" as outlined in the Cable Convention and (2) the "infraction" occurred within the Cable Act's geographical scope
 The Cable Convention applies to cables landed "in the territories, colonies or possessions of one or more of the High Contracting Parties." 24 Stat. at 993 (emphasis added). In The Carl Frederick, Stephens, and Blanchard, both ends of the cables were landed in a single country. The United States is a (i.e. "one") contracting party to the convention. Therefore, the cables discussed in these cases would appear to fulfill the first requirement for coverage by the Cable Act.
 Section 33 of the Cable Act provides that the statute applies:
 whether the infraction complained of shall have been committed within the territorial waters of the United States or on board a vessel of the United States outside of said waters.
 47 U.S.C. § 33 (1988). Although the statute does not define "territorial waters," there is substantial authority that the term refers to all inland waters, including rivers, harbors, and bays within a country's land territory, and the "marginal" or "territorial" sea extending a certain distance from the coastline toward the high seas. See Island Airlines, Inc. v. Civil Aeronautics Bd., 352 F.2d 735 (9th Cir.1965) (citing to United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960) and quoting district court); Philip C. Jessup, The Law of Territorial Waters and Maritime Jurisdiction xxxvii (1927); Black's Law Dictionary 1320 (5th ed. 1979); Webster's Third New International Dictionary 2361 (1961); Webster's New International Dictionary 2607 (2d ed. 1948). The incidents discussed in these cases took place in two rivers and a bay. For this reason, they would appear to fall within the geographical scope of the statute.
 
 
 [13]
 United States v. North German Lloyd, 239 F. 587 (S.D.N.Y.1917) merely notes that the penalties provided by the Cable Act are no bar to a suit for damages. Id. at 589 (citing what is now 47 U.S.C. § 28). The case is decided on common law negligence grounds. Postal Tel. Cable Co. v. P. Sanford Ross Inc., 221 F. 105 (E.D.N.Y.1915), mentions the statute in describing another case. In the third case, The William H. Bailey, 100 F. 115 (D.Conn.1900), violation of the statute does appear to have been one of four grounds for a finding that a ship owner either willfully or negligently cut a submarine cable. Id. at 117. The case does not suggest, however, that the cable owner's right to recover flowed from the Cable Act
 
 
 [14]
 We do not decide whether the Limitation of Liability Act has this effect
 
 
 [15]
 In its motion for a judgment on the pleadings, AT & T argued that the defendants' actions constituted
 violation[s] of the [Cable Act], the International Convention of Submarine Cables, the Geneva Convention On The High Seas, and customary international law, all of which preclude [the defendants] from claiming the benefit of limitation of liability as provided in [the Limitation of Liability Act].
 App. 97 (emphasis added) (citations omitted). While AT & T's complaint asserted an additional cause of action based on "maritime tort" law, app. 131, it did not suggest in its motion that its maritime tort law cause of action would preclude limitation of defendants' liability pursuant to the Limitation of Liability Act.
 On appeal, AT & T argued only that the Cable Act and the Cable Convention each gave rise to private rights of action which superseded the Limitation of Liability Act. Although some language in the legislative history of the Cable Convention suggests that the treaty is not self-executing, Protection of Submarine Cables, H.R. Doc. No. 60, 50th Cong., 1st Sess. 5 (1888), we will leave it to the district court to decide in the first instance this question.